# Richmond.

GOLDMAN v. COMMONWEALTH.

100    865
j106    870
106    871

December 4, 1902.

1. CRIMINAL LAW—*Presumption of Innocence—Burden of Proof—Case at Bar.*—In a criminal prosecution the burden is on the Commonwealth to prove not only that the crime charged in the indictment has been committed, but also that it was committed by the accused, and the evidence must exclude every reasonable doubt of the guilt of the accused. He is not to be prejudiced by the inability of the Commonwealth to point out any other guilty agent, nor is he called upon to vindicate his own innocence by naming the guilty man. In the case at bar, the evidence does not sufficiently establish the fact that the person whose property was alleged to have been "feloniously bought and received" was ever the owner of the property alleged to have been bought by the prisoner.

2. CRIMINAL LAW—*Buying or Receiving Railroad Brasses—Code, Sec. 3715—Possession—Presumption of Criminal Intent.*—In a prosecution under section 3715 of the Code, as amended (Acts 1889-'90, p. 30), forbidding any person "to buy or receive" railroad iron, brass, &c., with intent to defraud, and declaring that possession, unless bought or received from certain persons enumerated in the statute, shall be *prima facie* evidence of such intent, it is incumbent on the Commonwealth to prove, as an essential element of the offence, that such articles were bought or received in the manner forbidden by the statute before any presumption will arise from the possession of such articles. The presumption declared by the statute to arise from possession is of the *intent*, and not of the fact that the articles were bought or received.

3. CRIMINAL LAW—*Buying or Receiving Railroad Brasses—Case at Bar—Custody—Criminal Possession.*—In the case at bar, if it be conceded that the *corpus delicti* was proved, the prisoner's guilt has not been established by the evidence. He was indicted for buying and re-

ceiving railroad brasses with intent to defraud. Giving full weight to the evidence of the Commonwealth, as on a demurrer to the evidence, it only establishes that the prisoner had the mere custody of the brasses for the purpose of delivering them at the depot to be shipped to the consignee. Such custody alone does not amount to guilty possession within the meaning of the statute.

Error to a judgment of the Corporation Court of the city of Roanoke, rendered July 10, 1901, on an indictment for a felony.

*Reversed.*

The prisoner was indicted for buying and receiving railroad brasses, with intent to defraud. The evidence, and all of the evidence adduced on the trial, is given below as nearly as practicable in the language in which it appears in the record.

W. G. Baldwin, a witness called by the Commonwealth, testified that he was special agent of the Norfolk and Western Railway Company, and as such, among other things, it was his duty to investigate the violation of the law with respect to the property of the Norfolk and Western Railway Company; that he was also by profession a detective; that about a year prior to March last, he went to the junk-shop of Goldman, and found R. A. Goldman, the prisoner, there in charge, and the witness then and there cautioned the prisoner, R. A. Goldman, not to buy any journal brasses of the Norfolk and Western Railway Company, and showed him a mark or stamp on the brasses by which he, the said Goldman, could tell whether the said brasses were the property of the Norfolk and Western Railway Company; and that, on March 14, 1901, he was sent for to come to the freight depot of the Norfolk and Western Railway Company, in the city of Roanoke, Virginia, to examine some railroad brasses. Upon his arrival there he found piled up on the floor in a room of the freight depot a lot of railroad brasses, etc., among which were twenty-one locks, apparently whole; nine of these locks were stamped "N. & W. R. R.," marked

Switch No. 78, to be opened with a bent or crooked key. Nine of them were stamped "N. & W. R. R.," to be opened with a straight key. Three of them were stamped "A. M. & O. R. R." There were also seven pieces of locks, on which were stamped "N. & W. R. R." These locks having been introduced in evidence, and being then in the presence of the jury, and of the witness, the witness stated that they were similar to the locks he saw in the room of the freight office on the 14th of March; that the good locks, while at the freight office, were strung on a string, and the string on which the locks were strung when produced before the jury was similar to the one on which they were strung at the freight depot; that the broken locks were not put on a string at the freight depot; that all of these locks, with certain other railroad brasses, were put in a bag at the freight depot and sealed up and left there. The witness further stated that the railroad brasses and switch-locks then before him were exactly like those that he saw on March 14th, and he believed they were the same locks. From the freight depot the witness went for Officer W. J. Rigney, and asked him to accompany the witness to the junk-shop of Goldman, which Rigney did. On their arrival at the junk-shop they found the prisoner at the bar, R. A. Goldman, in charge of the place, and saw no other person there but a small crippled boy on the outside of the shop. Witness first asked the prisoner if he had bought any railroad brasses, since he had previously notified him not to do so, and the prisoner replied that he had not, except some brasses he had gotten from a showman. Witness then asked the prisoner if he had shipped any Norfolk and Western railway switch-locks in a shipment made of old lead a few days before to Baltimore, and the prisoner replied that he had not, except some old locks bought of Mr. Beeton, and that these were the only locks shipped at that time; that witness then asked him how many switch-locks he had gotten from Mr. Beeton, and he replied that he had not gotten more than eight or ten from him,

and that all that he did get were broken. Witness did not tell the prisoner at that time that the barrel marked old lead had been opened at the freight depot and certain switch-locks found in the same. The prisoner was in charge of the place, and seemed to have control over it; his expressions were always "I bought" or "I didn't buy," and never said anything about the firm. The prisoner had charge of the books of the junk-shop establishment, and showed the witness an entry on his books dated on the 4th day of March, 1901. The witness further stated: "The book now handed me is the book prisoner showed me on the occasion of my visit; and the following is the entry which now appears on said book:"

"Beeton's bicycle-shop, Campbell avenue, S. W., 73 lbs. scrap brass fittings and N. & W. R. R. locks, $2.00."

Continuing, the witness said that the junk-shop of Goldman, as well as the freight depot, are both in the city of Roanoke, Virginia; that the words "N. & W. switch-locks" were not on the books at that time, but were put on there afterwards—"I am absolutely certain of this, as certain as that I am sitting here, or that I am living"; that the locks and brass then shown were the locks that he (Baldwin) found at the depot at the time mentioned. He thought then that there were ten broken locks, and saw now only nine; that there were twenty-one locks that seemed to be good; that three of these good locks were marked "A. M. & O.," nine of them marked "No. 78, N. & W. R. R." switch-locks, and the residue stamped on the back "N. & W. R. R."; that as to how those locks came there, or where they came from, he had no personal knowledge; that Mr. Beeton, the man referred to by R. A. Goldman in his conversation with him, lives in the city of Roanoke, and is a locksmith and a repairer of guns and machinery; that when he went down to Goldman's place, he took with him Officer Rigney, of the police force of the city of Roanoke; that when he went down to the junk-shop and had the conversation with the prisoner, the latter showed

him a pan in which he said the switch-lock had been brought to him by Beeton, and it was then empty.

Thereupon the witness, the examination being concluded, left the stand, and after a short time returned into court and asked permission to make a statement. Whereupon he further testified that since he had left the stand he had had a conversation with R. M. Robinett, and that he was then satisfied that he was mistaken in saying that the words "N. & W. R. R. switch-locks" had been added to the book entry shown him by the accused since he saw it; that Robinett told him that the entry on the books, as above set out, was on the books at the time.

H. D. Guy, another witness introduced by the Commonwealth, testified that he was the freight agent of the Norfolk and Western Railway Company, and had charge of its freight station in the city of Roanoke; that on the    day of    there was brought to the freight station of the Norfolk and Western Railway Company a barrel consigned to the Ajax Metal Co., of Philadelphia, with the name of S. Goldman thereon as consignor; that the bill of lading was made out in the name of S. Goldman, and that the paper then handed him was the one issued to the shipper. It was marked "old scrap lead." He had the package opened, and in it found the pieces of journal brass and switch-locks then produced before the court and referred to by Mr. Baldwin. They were packed in an old lard tierce. They were put in a bag and deposited in a room in the freight station under his charge, under lock and key. The things were afterwards carried to the grand jury room, and from the grand jury room back to his office, and from his office to the Police Court. They were delivered to one of the court officers, since which time he had not had charge of them.

The witness being asked if the switch-locks shown him were the property of the Norfolk and Western Railway Company, replied: "Yes, if the railway company can identify them as belonging to it."

The witness further testified that a short time after the re-
ceipt of the package referred to, the accused, R. A. Goldman,
came to him at his place of business and stated that a letter had
been received from the consignee, claiming that there was a
shortage, and he wanted to know how it was that the shortage
occurred. Witness told him that the barrels had been opened,
and the switch-locks and brasses had been taken out, and that
probably accounted for the shortage. Prisoner offered to show
witness the letter that had been received, but witness said it
was of no use for him to see it. Witness, in response to a ques-
tion, said that the Norfolk and Western Railway Company was
incorporated.

And the Commonwealth, to further maintain the issue on its
part, introduced a witness, W. J. Rigney, who testified that he
is a member of the police force of the city of Roanoke, and that
on the 14th day of March last W. G. Baldwin asked him to ac-
company him to the junk-shop of Goldman; that he did accom-
pany Baldwin to the junk-shop of Goldman, on Norfolk avenue,
in the city of Roanoke, Virginia, and that they found there R.
A. Goldman, the prisoner at the bar. Baldwin asked the pris-
oner if he had bought any Norfolk and Western railway brasses
or switch-locks since the former had told the prisoner about a
year ago not to purchase such, and the prisoner replied that
he had not purchased any railroad locks since he (Baldwin)
had notified him not to do so, except a few which he had gotten
from Beeton, all of which were broken. A few little pieces of
old brass and old pieces of locks were shown the witness and
Baldwin in a pail, which would hold two or two and one-half
gallons. A part of the time, while Baldwin and Goldman were
talking, witness was some eight or ten feet from Baldwin and
Goldman, who were standing further in the shop. He might
not have heard all the conversation, as he was looking at
some old beer bottles of the Virginia Brewing Company,
which he thought were stolen. There was no one else in the

junk-shop on this occasion, but there was a little crippled boy in the yard, who came into the house of the shop where they were some time after they had gotten there.

And the Commonwealth, to further maintain the issue on its part, introduced a witness, R. M. Robinett, who testified that he was a special officer of the Norfolk and Western Railway Company; that in March, 1901, he ascertained that some of the large brass lamps in some of the passenger cars were missing, and that he had reason to believe that they had been stolen, and he was trying to find them, and suggested that an examination be made of the barrel of junk then in the freight depot of the Norfolk and Western Railway Company, consigned under the name of S. Goldman, on the     day of    , 1901.  Accordingly, the barrel was opened in the presence of himself and Mr. Guy, the freight agent, and none of the missing lamps were found, but the journal brass and the switch-locks now in court, consisting of twenty-eight railroad switch-locks, twenty-one of which were whole locks, and seven were parts of locks, one side of the same being absent, were found therein.  Eighteen of these whole locks had stamped on their back the initials of the "N. & W. R. R."  Nine of the whole locks bear the number "78," and had stamped on their clasp "N. & W. R. R." The locks being in the presence of the jury, the witness sorted out the broken locks, and those that had "N. & W. R. R." stamped on their face, and those that had "N & W. R. R." stamped on their clasp.  He further testified that the locks examined by him in the presence of the jury were just like the same locks found in the barrel at the N. & W. freight office on the 14th of March, marked old lead, and consigned in a barrel with the name of S. Goldman on it; that the barrel weighed between 700 and 800 pounds; that on examination the locks seemed to be of two different kinds; that three whole locks were stamped "A. M. & O. R. R.," and eighteen of the whole locks were stamped "N. & W. R. R."; and that there were eight broken locks stamped "N. & W. R. R."; and the

witness took a key from his pocket, which he said he had just obtained from a switchman on the yards of the Norfolk and Western railway in Roanoke city, with which he unlocked two of the whole locks upon which were stamped "N. & W. R. R.," but said this key would not unlock the other whole locks, for the reason that some were of a different pattern from the two which he did unlock, and required a straight key, and witness thought if he had this straight key he could unlock a number of such locks. The witness then picked up some of the locks stamped "N. & W. R. R.," and said that they were of a new pattern. The witness stated that he did not know anything about the three locks upon which were stamped "A. M. & O. R. R.," and so far as he knew, they were not now in use on the yards there, and he knew of no key that would unlock the locks thus stamped. The two locks that he could unlock were in good repair and fit for use, and the other whole locks appeared to be in good order. The two locks that he could unlock with this key and the eight straight key locks had been in use on the yards in Roanoke for eight or ten years. The locks stamped "A. M. & O. R. R." were not in use in the yards in Roanoke, but, so far as he knew, might be in use on other yards of the road. The witness stated that the paper then shown him was a detailed report made by S. Goldman to the Chief of Police, on the 4th day of March, 1901, and, so far as relates to the entry of this transaction, is as follows:

"Beeton's bicycle-shop, Campbell avenue, S. W., 73 lbs. scrap brass fittings and 1 lot N. & W. R. R. locks, $2.00."

The witness further said: "I saw this report at the time it was made, or shortly thereafter. I keep a pretty close account of these reports."

The Commonwealth then introduced as a witness H. C. Macklin, who testified that he was the general storekeeper for the Norfolk and Western Railway Company. His attention being then directed to the twenty-eight railroad switch-locks, then in

evidence before the jury, he was asked whether the locks before him were the property of the Norfolk and Western Railway Company. Witness stated that all the locks of the company had "N. & W. R. R." stamped on them; that he did not know anything about locks stamped "A. M. & O. R. R.," and there was nothing on any of the locks by which he could positively identify them as the locks of the Norfolk and Western Railway Company, and witness could not say that any of them were ever in the possession of the Norfolk and Western Railway Company; that he could not say absolutely that the locks stamped "N. & W. R. R." were the property of the Norfolk and Western Railway Company, but that all purchases of locks for the Norfolk and Western Railway Company were made through his office; that when switch-locks got out of repair they were shipped to the manufacturers in Philadelphia to be repaired and shipped back, and such locks as could not be repaired in Philadelphia were sent back to his office; that neither new nor repaired locks were ever sold by the Norfolk and Western Railway Company to any person; that they were given to the employees of the road only for the use of the road; that eighteen of the switch-locks then before him appeared to be sound and serviceable, and that he would not have shipped locks in as good condition as they were then to be repaired; that the switch-locks of the company are made by 　　　 , in the city of Philadelphia, Pennsylvania, and have stamped upon them the initials of the road; that this company, he supposed, makes switch-locks for other railroad companies, having the initials of the road stamped upon their respective locks; that the key for the locks of the Norfolk and Western Railway Company would not fit locks made for other railroad companies; that the manufacturers of these locks never furnish them to the N. & W. Railway Company except upon the order of the company, and for its purposes, and upon forms or models approved by the rail-

road company; that the railroad had to have this done for its
own protection.

The Commonwealth then introduced as a witness E. L.
Slaughter, who testified that he was employed by the Norfolk
and Western Railway Company, at its freight depot in the city
of Roanoke, as check clerk; that on the 11th day of March,
1901, he received a barrel from R. A. Goldman, the prisoner at
the bar, marked "S. Goldman," and consigned to the Ajax
Metal Company, of Philadelphia; that it was brought to the
depot by the prisoner in a wagon, and, he thought, driven by a
negro driver; that he came with the bill of lading which had
been introduced in evidence; that the barrel was received to be
shipped, and was the same barrel which was opened, and the
barrel in which were found the switch-locks which were then in
court; that the bill of lading heretofore referred to was the one
issued on that occasion, and it was brought to the depot already
made out; that the prisoner generally brought to the depot
packages marked S. Goldman as a shipper, and that the bill of
lading was signed and delivered to the prisoner.

Here the bill of lading referred to above was put in evidence,
but it is not deemed necessary to insert it in this statement.

The Commonwealth then introduced as a witness R. E.
Beeton, who testified that he resides in the city of Roanoke, is
a locksmith and a repairer of machinery; that some eight or
ten years ago some officers of the Norfolk and Western Railroad
Company brought to him a lot of broken and out of repair
switch-locks; that he repaired all that could be repaired, but
threw aside in a pile those that could not be repaired, and that
they remained there until he had to move, and not having a
place to put them when he moved, he decided to take them to
the junk-shop; that there were a small number, not half so
many as the pile introduced in evidence, and they were all
broken and in such a condition that they could not be repaired;
that they were taken to the junk-shop of Goldman along with

other junk, principally iron, steel and old files, and sold, he receiving therefor $2.00. Witness stated that when he first got to the junk-shop, he saw only R. A. Goldman, the prisoner at the bar, who told him to unload the junk; that while the junk was being unloaded the old man came out, and the price was fixed between the witness and the old man, and that some conversation passed between the old man and himself; that after a while the old man went back into the building, but soon returned, saying that he would give him $2.00 for all that he had. Witness received his money and left. The witness made no bargain with the prisoner at the bar, and received no money from him. The locks being present in court, and the witness having examined them, the witness stated that the seven or eight broken locks there present were locks similar to those carried to the junk-shop; that he did not carry to the shop any locks in the condition of the twenty-one whole locks then present before him; that the only locks he did carry to the junk-shop were in the condition of the broken locks which he picked out in the pile, and from which one side of the lock was absent; that all the broken locks carried by the witness to the junk-shop would not fill a half-gallon pan.

On cross-examination, witness stated that he did not know how much junk he carried to the junk-shop, but that he carried only a few broken locks altogether in a small pan; that the junk was not loaded in the wagon by him, nor did he unload or help to unload it.

The Commonwealth then introduced, as a witness, J. E. Craig, who testified that he was one of the deputies of the sergeant of the city of Roanoke; that the switch-locks and brasses then in court were the same that were turned over to him for safe-keeping by W. G. Baldwin, at the adjournment of the grand jury; that he had kept them since that time under a lock and key.

It was admitted by the defence that the Norfolk and Western

Railway Company is a corporation, such admission to have the same force and effect as if the same had been proven by witnesses.

This was all the evidence on behalf of the Commonwealth. The only evidence introduced on behalf of the prisoner was the testimony of the prisoner himself, who testified that the junkshop in question was the property of his mother, S. Goldman; that she was a regular licensed junk-dealer; that he, R. A. Goldman, was nineteen years old, had no interest in the business, and received no salary for his services; that his brother, Herman Goldman, was the manager; that he, R. A. Goldman, stayed about the place and did whatever he was told to do; that he could not recollect whether he carried to the depot the barrel of junk referred to in the testimony of Mr. Slaughter, but it was very probable that he did; that he very often performed that character of work; that if he was told to carry it there, he did so; that he did not pack the barrel, and did not know what was in it, and had nothing to do with it; that he did not buy or receive the switch-lock or brasses then in court, and had nothing to do with the purchase of them; that he was present when Mr. Beeton brought the junk referred to in his testimony to his mother's place of business; that he did not have anything to do with the purchase of it, or the receipt of it, or the unloading of it; that it was unloaded by another party and piled up to one side, and he thought that it was taken from that pile when it was shipped; that he knew neither of the purchase or receipt of any switch-locks, except what was bought from Mr. Beeton; that he remembered Baldwin coming to the place of business of his mother, with Rigney, at the time referred to by him; that he did not tell him what Baldwin said he told him, except that Baldwin asked him if he had bought any railroad brasses or any switch-locks since he had spoken to him about that matter a year before, to which he replied that no switch-locks had been bought except from Mr. Beeton; that he did not have the other

conversation with Baldwin, as stated by Baldwin; that some time after the shipment of the barrel of junk to the Ajax Metal Company, a letter was received from them claiming a shortage; that he was sent with this letter to Mr. Guy to inquire about it, when he was informed that the barrel had been opened and a part of the things taken out; that this would account for the shortage. This was the first he knew of the opening of the barrel.

On cross-examination, witness stated that his father frequently went away to buy junk, as did his brother, Herman; that sometimes his father and brother, Herman, were off at the same time, and that in their absence he had charge of the junk business, but this had not been the case for some time, about a year; that he stayed around the junk-shop when he was not elsewhere; that he, personally, did not keep the books required by law of junk-dealers, and then in evidence before him; that he did not know who kept them; that he could not say that the entries in the book were made by his brother—he did not know in whose handwriting they were. When asked to find an entry made by himself in the book which purported to contain the entries of purchases for the junk-shop, the witness pointed out one entry on page 172, which he said he had made. He did not know who made the other entries, but supposed his brother did; but could not say in whose handwriting the entries in the book were.

*Scott & Staples* and *Hart & Hart*, for the plaintiff in error.

*Attorney-General William A. Anderson*, for the Commonwealth.

WHITTLE, J., delivered the opinion of the court.

Plaintiff in error, R. A. Goldman, was jointly indicted along with S. Goldman, in the Hustings Court of the city of Roanoke,

for feloniously buying and receiving certain railroad brass, known as switch-locks, the property of the Norfolk and Western Railway Company, with intent to defraud. There was a demurrer and motion to quash the indictment, both of which were overruled, and thereupon the prisoner, R. A. Goldman, pleaded not guilty. At the trial, the jury found the prisoner guilty, as charged in the indictment, and fixed his punishment at sixty days in the city jail. The court overruled the prisoner's motion to set aside the verdict and grant him a new trial, and rendered judgment upon the verdict, and the case is here upon a writ of error to that judgment.

From the view taken of the case by this court, it is only necessary to notice the last assignment of error, which involves the sufficiency of the evidence to warrant a conviction of the prisoner of the felony of which he stands charged.

It will not be inappropriate in approaching the consideration of that question to do so in the light of certain well settled principles of law which inhere in every prosecution against a citizen for crime.

It devolves upon the Commonwealth to prove, first, the *corpus delicti*, that is, the fact that the crime charged has been actually perpetrated; and, secondly, that it was committed by the accused. To justify a conviction, the evidence must be so convincing as to exclude every reasonable doubt of the guilt of the prisoner.

In *McBride's Case*, 95 Va. 826, this court said: "The prisoner is presumed to be innocent until his guilt is established, and he is not to be prejudiced by the inability of the Commonwealth to point out any other criminal agent, nor is he called upon to vindicate his own innocence by naming the guilty man. He rests secure in that presumption of innocence until proof is adduced which establishes his guilt beyond a reasonable doubt, and whether the proof be direct or circumstantial, it must be such as excludes any rational hypothesis of the innocence of the prisoner."

In the case in judgment, the *corpus delicti* is that the prisoner did "feloniously buy and receive twenty-eight pieces of railroad iron, brass, metal and composition thereof, and known as switch-locks, of the value of fifty cents each, being the goods and chattels . . . of the Norfolk and Western Railway Company, a corporation, with intent feloniously to defraud."

The act upon which the prosecution is based is found in section 3715 of the Code, as amended by Acts of 1889-'90, p. 30, which declares that "If any person buy or receive," amongst other things, articles such as are described in the indictment, "with intent to defraud, he shall be confined in the penitentiary not less than one, nor more than two, years; or in the discretion of the jury, in jail not exceeding one year." And the statute further provides that possession of such articles, so bought or received from any other person than the manufacturer thereof, or his authorized agent, or of a regularly licensed dealer therein, shall be *prima facie* evidence of such intent.

It will be observed that the statute does not declare that possession of the contraband articles shall be *prima facie* evidence, or, indeed, any evidence that they were bought or received from any other person than the manufacturer thereof, &c.; but that when so bought or received, possession shall be *prima facie* evidence of an intent to defraud. So that before any such presumption can arise from the possession of the articles, it is incumbent upon the Commonwealth to prove, as an essential element of the offence, that they were bought or received in the manner proscribed by the act. Upon that subject, there is no evidence in the record.

Nor does the evidence relied on for that purpose establish with that degree of conclusiveness required in criminal prosecutions, that the Norfolk and Western Railway Company has lost any of its switch-locks, or that those described in the indictment are the property of that company. On the contrary, but two witnesses testify directly on that point. Neither proves that the

company had lost any switch-locks, and both decline to positively identify the locks in question as the company's property; although they testify to circumstances tending to support that theory. On the other hand, the witness Beeton, introduced by the Commonwealth, testifies that the Norfolk and Western Railroad Company, the immediate predecessor of the Norfolk and Western Railway Company, each having the same initials, "N. & W. R. R.," used locks similar to the ones in question. *Non constat* but that these locks were the property of the old company, and not of its successor. It is true, another witness testifies that he unlocked two of these switch-locks with a key furnished him by a switch-tender of the Norfolk and Western Railway Company, but the same, doubtless, would have been the case with switch-locks of the old company of similar pattern.

It does not appear that the Norfolk and Western Railway Company had ever missed any of its switch-locks. "Where the alleged owner thinks he has lost the property, but will not swear that he has, . . . the ownership is not, by this evidence, sufficiently proved." 2 Bishop on Crim. Law, sec. 752. Such alleged owner could hardly expect a jury to find that his ownership of property was proved beyond a reasonable doubt, when his own doubts were so great that he could neither swear that he had lost, nor that the property in question was his own.

The prosecution originated as follows: Some of the large brass lamps, belonging to the Norfolk and Western Railway Company, had been stolen from its passenger cars, and the agents, suspecting that they might be found in the barrel of junk then in the freight depot, consigned in the name of S. Goldman, shipper, to the Ajax Metal Company, of Philadelphia, opened the barrel and discovered the articles described in the indictment.

Whilst the witness, Baldwin, a detective in the employment of the Norfolk and Western Railway Company, testifies with characteristic zeal, in his effort to fix the guilt upon the accused,

a careful scrutiny of his evidence shows more or less conflict between it and that of other witnesses for the Commonwealth. These discrepancies are the proper subject of comment, and must impair the value of his testimony. At his instance, Officer Rigney accompanied him to the junk-shop of S. Goldman and was present at a conversation between him and the prisoner. Yet, so far as appears from his testimony, Rigney heard no admission from the prisoner that he bought and sold junk in S. Goldman's shop, or that "he had bought no switch-locks except some brasses which he had gotten from a showman," as Baldwin testified. His testimony on that point is that prisoner stated that he had not bought any railroad locks, since Baldwin notified him not to do so, except a few which he got from Beeton, all of which were broken. True, Rigney says, he was a few feet distant during part of the conversation between Baldwin and prisoner, but he certainly heard the question and answer referred to, and his testimony as to what that answer was is essentially different from that of Baldwin's version of it.

Again, the action of the prisoner in connection with the purchase of locks from Beeton repels the inference to be drawn from the alleged admission to Baldwin, that he was in control of the shop and business, and tends to show his true status in relation to the business of S. Goldman.

Beeton distinctly testifies that, when he carried certain junk, including the broken switch-locks, to the shop, prisoner told him to unload it, but that the sale was to prisoner's father, who came into the shop and fixed the price and paid the purchase money.

The witness Baldwin likewise testified that prisoner showed him an entry in the books, dated March 4, 1901, as follows: "Beeton's bicycle-shop, Campbell avenue, S. W., 73 lbs., scrap brass fittings and N. & W. R. R. locks, $2.00;" that the words "N. & W. switch-locks" were not in the books at the time, but were put there afterwards; that he was absolutely certain of

· this, as certain as that he was sitting there, or that he was living. He subsequently came back on the witness-stand, and admitted that he was mistaken, and testified that the entry had not been changed; that the witness Robinett had told him that he was mistaken.

"Upon a demurrer to evidence, in ascertaining the facts established by any one witness, everything stated by him, as well on his cross-examination as upon his examination-in-chief, must be considered. Facts imperfectly stated in answer to one question may be supplied by the answer to another. And where, from one statement considered by itself, an inference may be deduced, that inference may be strengthened or repelled by the facts disclosed in another." *Ware* v. *Stephenson*, 10 Leigh, 161.

Now it appears from the evidence on behalf of the prisoner, not in conflict with any direct testimony adduced by the Commonwealth and just inferences to be drawn therefrom: That S. Goldman is the mother of the prisoner, a minor, nineteen years of age; that she is a regularly licensed junk-dealer, occupying a shop and carrying on business in the city of Roanoke; that the business is managed by her son, Herman Goldman; that prisoner had no interest in the business, and received no wages for his services, but stayed about the shop, and did what he was bidden to do. Among his other duties was that of accompanying to the depot of the Norfolk and Western Railway Company freight, belonging to S. Goldman, intended to be shipped to other points. On March 11, 1901, there was taken to the depot of the railway company in the city of Roanoke, by the prisoner, in company with a negro drayman, a barrel marked "S. Goldman," to be shipped to the Ajax Metal Company, of Philadelphia. The barrel was received for shipment, the contents classified as "scrap lead," and a bill of lading issued in the name of S. Goldman, consignor, and delivered to the prisoner.

There is no evidence tending to show that the prisoner had anything to do with packing the barrel, or any knowledge of its

contents, other than what may be inferred from his alleged statement to Detective Baldwin, that the shipment of 800 pounds of junk, contained no brasses or locks, other than those bought of Beeton, a statement which rather tends to confirm the theory that prisoner had no knowledge of the fact that the property in question was ever in the possession of his mother, or formed any part of the contents of the package referred to. The property was not claimed by the accused, and there is no suggestion that he was in anywise interested in its purchase or sale. His only possession of the barrel, in evidence in the case, is the fact that he delivered it, in company with the negro drayman, at the Norfolk and Western depot. His agency extended to overlooking the shipment of the freight, and that of the drayman to hauling the junk to the depot. Each had the barrel in custody for the purposes of his agency; neither had possession of it in the sense of ownership.

It need hardly be argued that by no just interpretation can such custody alone be construed to amount to guilty possession in contemplation of the statute. The possession intended by the statute must imply something more than mere physical contact, otherwise, a drayman or transportation company, having the custody of contraband articles for transportation merely, would be liable to indictment. The statute must, therefore, be construed to mean a guilty possession, as contradistinguished from mere custody, without claim of title to, or interest in the subject.

It further appears that S. Goldman received a letter from the consignees of the junk complaining of a shortage in weight of the shipment in question, and that the prisoner, on behalf of his mother, carried the letter to the agent of the company and demanded an explanation of the shortage. The enquiry of the detective had already apprised him of the fact that the company was at that time investigating the question as to whether any of its switch-locks had passed through his mother's junk-shop; and

it is hardly reasonable to suppose, if he was possessed of the guilty knowledge attributed to him, that he would have courted an investigation likely to connect him with the commission of a felony. Applying the doctrine of a demurrer to evidence in all its stringency; and according full faith and credit to the testimony of Baldwin, the evidence is, nevertheless, plainly insufficient to warrant a verdict of conviction.

In addition to an entire absence of proof of the *corpus delicti*, the following language of Judge Moncure (in a case in which the appellate court, upon writ of error, set aside a verdict of conviction and awarded a new trial, and the doctrine of which has repeatedly received the sanction of this court. See cases cited in Shepard's Index to 29th Grattan) is apposite to the evidence relied on to connect the prisoner with the alleged offence: "These circumstances, taken singly or altogether, while they create a suspicion of guilt, are yet inconclusive and wholly insufficient to prove such guilt, but are also consistent with the fact of innocence. If they be not at least as consistent with the fact of innocence, as with the fact of guilt, they certainly do not amount to such degree of proof as to connect the accused with the offence, and to warrant his conviction thereof." *Johnson's Case*, 29 Gratt. 814. And in *Burch's Case*, 1 Virginia Decisions 861, it was said that the verdict should be set aside when the evidence makes only a case of suspicion or probability of guilt. See also *Brown's Case*, 97 Va. 791.

An adherence to the basic principles upon which the criminal jurisprudence of this Commonwealth has ever rested is far too important to justify a departure from them in order to meet the exigencies of particular cases; and the hurtfulness to society of the class of offences within the purview of the statute, affords no justification for the court's sustaining convictions in doubtful cases by way of prevention.

It follows from what has been said, that the judgment com-

plained of must be reversed, the verdict of the jury set aside, and the case remanded for a new trial to be had therein.

KEITH, P., dissenting:

Counsel for plaintiff in error place great reliance upon the demurrer to the indictment, and the unconstitutionality of the statute upon which it is framed, but the court, in its opinion, has not passed upon these assignments, and as in my judgment the act in question, as construed by the opinion of the court, merely establishes a rule of evidence and is therefore clearly constitutional, I shall have nothing further to say upon this subject.

The indictment follows the statute, and seems to be free from objection. The opinion of the court deals with the motion to set aside the verdict as contrary to the evidence, and upon that ground *alone* reverses the judgment of the Corporation Court. A mere difference of opinion as to the weight of the evidence would perhaps not justify, and would certainly not require, a dissenting opinion, but with all respect for the majority of the court and for the learned judge who speaks for it, I think the opinion tends to disturb and unsettle well-settled principles of law essential to the due administration of justice, and I therefore feel constrained to enter my dissent.

The facts of the case, as they appear to me, are as follows: W. G. Baldwin testifies that he is a special agent of the Norfolk and Western Railway Company, and as such, among other things, it was his duty to investigate violations of the law with respect to the property of the N. & W. Rwy. Co.; that he is by profession a detective; that about a year prior to March last, he went to the junk-shop of Goldman, and found R. A. Goldman, the prisoner, in charge, and the witness then and there cautioned the prisoner not to buy any journal brasses of the N. & W. Rwy. Co., and showed him a mark or stamp on the brasses by which he, the said Goldman, could tell whether the brasses

were the property of the N. & W. Rwy. Co.; that on March 14, 1901, he was sent for to come to the freight depot of the N. & W. Rwy. Co., in the city of Roanoke, Virginia, to examine some railroad brasses. Upon his arrival at the depot he found piled up on the floor in a room of the freight depot a lot of railroad brasses, etc., among which were twenty-one locks, apparently whole; nine of these locks were stamped "N. & W. R. R.," marked switch No. 78, to be opened with a bent or crooked key. Nine of them were stamped "N. & W. R. R.," to be opened with a straight key. Three of them were stamped "A. M. & O. R. R." There were also seven pieces of locks, on which were stamped "N. & W. R. R." These locks having been introduced in evidence, and being then in the presence of the jury and in the presence of the witness, he stated that they were similar to the locks he saw in the room of the freight office on the 14th of March; that the good locks, while at the freight office, were strung on a string, and the string on which the locks were strung when produced before the jury was a similar string to the one on which they were strung at the freight depot; that the broken locks were not put on a string at the freight depot; that all of these locks, with certain other railroad brasses, were put in a bag at the freight depot and sealed up and left there. He further says that the railroad brasses and switch-locks are exactly like those he saw on March 14th, and he believed they were the same locks. From the freight depot the witness went for Officer W. J. Rigney, and asked him to accompany the witness to the junk-shop of Goldman, which Rigney did. On their arrival at the junk-shop they found the prisoner, R. A. Goldman, in charge of the place, and saw no other person there but a small crippled boy on the outside of the shop. Witness first asked the prisoner if he had bought any railroad brasses since he had previously notified him not to do so, and the prisoner replied that he had not, except some brasses he had gotten from a showman. Witness then

asked the prisoner if he had shipped any N. & W. Rwy. switch-. locks in a shipment made of old lead a few days ago to Balti-. more, *and the prisoner replied that he had not, except some old. locks bought of Mr. Beeton, and that these were the only locks shipped at that time;* that the witness then asked him how many switch-locks he had gotten from Mr. Beeton, and he replied that he had not gotten more than eight or ten from him, and that all he did get were broken.

Thereupon H. D. Guy was introduced for the Commonwealth, who testified that "he is the freight agent of the N. & W. Rwy. Co., and had charge of its freight station in the city of Roanoke; that on the          day of          there was brought to the freight station of the N. & W. Rwy. Co. a barrel consigned to the Ajax Metal Co., of Philadelphia, with the name of S. Goldman thereon as consignor, the bill of lading was made out in the name of S. Goldman, and that the paper now handed him was the one issued to the shipper. It was marked 'old scrap lead.' He had the package opened, and in it found the pieces of journal brass and switch-locks now produced before the court, and referred to by Mr. Baldwin. They were packed in an old lard tierce. They were put in a bag and deposited in a room in the freight station under his charge, under lock and key. The things were carried to the grand jury room, and from the grand jury room back to his office, and from his office to the Police Court. They were delivered to one of the court officers, since which time he has not had them." In answer to the question as to whether or not the switch-locks shown him were the property of the N. & W. Rwy. Co., he replied: "Yes, if the railway company can identify them as belonging to it."

This witness further testifies that a short time after the receipt of the package referred to, the accused, R. A. Goldman, came to him at his place of business and stated that a letter had been received from the consignee, claiming that there was a shortage, and he wanted to know how it was that the shortage

occurred.   Witness told him that the barrels had been opened,
and the switch-locks and brasses had been taken out, and that
probably accounted for the shortage.   He offered to show wit-
ness the letter that had been received, but he said it was no use
for him to see it.

And the Commonwealth, to further maintain the issue on its
part, introduced a witness, W. J. Rigney, who testified that he
was a member of the police force of the city of Roanoke, and
that on the 14th day of March last W. G. Baldwin asked him
to accompany him to the junk-shop of Goldman; that he did
accompany Baldwin to the junk-shop on Norfolk avenue, and
there found R. A. Goldman, the prisoner at the bar.   Baldwin
asked the prisoner if he had bought any N. & W. brasses or
switch-locks since the former had told the prisoner about a year
ago not to purchase such, and the prisoner replied that he had
not purchased any, except a few which he got from Beeton, all
of which were broken.   A few little pieces of old brass and old
pieces of locks were shown the witness by Baldwin in a pail.
A part of the time while they were talking, witness states that
he was some eight or ten feet from Baldwin and Goldman, who
were standing further in the shop, and that he might not have
heard all the conversation, as he was looking at some old beer
bottles of the Virginia Brewing Co., which he thought were
stolen; that there was no one else in the junk-shop on this occa-
sion, but that there was a little crippled boy in the yard.

R. M. Robinett testified that he was a special officer of the
N. & W. Rwy. Co.; that in March, 1901, he ascertained that
some of the large brass lamps in some of the passenger cars
were missing; that he had reason to believe that they had been
stolen; that he was trying to find them, and he suggested that an
examination be made of the barrel of junk then in the freight
depot of the N. & W. Rwy. Co., consigned under the name of
S. Goldman.   Accordingly, the barrel was opened in the pres-
ence of himself and Mr. Guy, the freight agent, and none of the

missing lamps were found, but the journal brass and switch-locks now in court, consisting of twenty-eight railroad switch-locks, twenty-one of which are whole locks, and seven are parts—one side of the same being absent—were found. Eighteen of these whole locks have stamped on their back the initial of the "N. & W. R. R." Nine of the whole locks bear the number "78," and have stamped on their clasp "N. & W. R. R." The locks being in the presence of the jury, the witness sorted out the broken locks and those that had "N. & W. R. R." stamped on their face, and those that had "N. & W. R. R." stamped on their clasp, and the witness stated that the locks examined by him in the presence of the jury were just like the locks found in the barrel at the N. & W. freight office on the 14th of March, marked old lead, and consigned in a barrel with the name of S. Goldman on it; that the barrel weighed between 700 and 800 pounds; that on examination the locks seemed to be of two different kinds. Three whole locks were stamped "A. M. & O. R. R.," and eighteen of the whole locks were stamped "N. & W. R. R.," and eight broken locks were stamped "N. & W. R. R." The witness then took a key from his pocket which he said he had just obtained from a switchman on the yards of the Norfolk and Western railway in Roanoke city, with which he unlocked two of the whole locks upon which were stamped "N. & W. R. R.," but said this key would not unlock the other whole locks, for the reason that some were of a different pattern from the two which he did unlock, and required a straight key, and witness thought that if he had this straight key he could unlock a number of these locks. The witness then picked up some of the locks stamped "N. & W. R. R.," and said they were of a new pattern; that he did not know anything about the three locks which were stamped "A. M. & O. R. R.," and so far as he knew they were not now in use in the yards in Roanoke, and he knew of no key that would unlock the locks thus stamped. The two locks that he could unlock were in good repair and fit for

use, and the other whole locks appeared to be in good order.
The two locks that he could unlock with this key and the eight
straight key locks have been in use on the yards here for eight
or ten years.

H. C. Macklin testified that he was the general store-keeper
for the N. & W. Rwy. Co., and, being asked whether the twenty-
eight switch-locks then in evidence before the jury were the
property of the N. & W. Rwy. Co., he stated that all the locks
had N. & W. stamped on them; that he did not know anything
about locks stamped "A. M. & O. R. R.," and that there was
nothing on the locks by which he could positively identify them
as the property of the N. & W. Rwy. Co.; that he cannot say
that any of them were ever in the possession of the N. & W.
Rwy. Co.; that he could not say absolutely that the locks
stamped "N. & W. R. R." were the property of that company;
but all purchases of locks for the N. & W. Rwy. Co. were made
through his office; that when switch-locks got out of repair they
were shipped to the manufacturers in Philadelphia to be re-
paired and shipped back, and such locks as could not be repaired
in Philadelphia were sent back to his office; that neither new
nor repaired locks were ever sold by the N. & W. Rwy. Co. to
any person, and that they were only given to the employees of
the road for the use of the road; that eighteen of the switch-
locks appeared to be sound and serviceable, and that he would
not have shipped locks in as good condition as they are now to
be repaired; that the switch-locks of the company are made by
      , in the city of Philadelphia, and have stamped upon
them the initials of the road; that this company, he supposes,
makes switch-locks for other roads, having the initial of the
road stamped upon their respective locks; that the key for the
locks of the Norfolk and Western Rwy. Co. would not fit locks
made for other railroad companies; that the manufacturers of
these locks never furnished them to the N. & W. Rwy. Co. ex-
cept upon the order of the company, and for its purposes, and

Dissenting Opinion.

upon forms or models approved by the railroad company; that the railroad had to have this done for its own protection.

E. L. Slaughter testified that he was employed by the N. & W. R. Co. at its freight depot in the city of Roanoke as check clerk; that on the 11th day of March, 1901, he received a barrel from R. A. Goldman, the prisoner at bar, marked "S. Goldman," and consigned to the Ajax Metal Co., Philadelphia; that it was brought to the depot by the prisoner in a wagon, and, he thought, driven by a negro driver; that he came with the bill of lading which has been introduced in evidence; that the barrel was received to be shipped, and was the same barrel which was opened and in which was found the switch-locks which are now in court. The bill of lading heretofore referred to is the one which was issued on that occasion, and it was brought to the depot already made out; that the prisoner generally brought to the depot packages marked S. Goldman as the shipper; the bill of lading was signed and delivered to the prisoner.

The bill of lading was then introduced and is in the usual form.

Beeton, another witness for the Commonwealth, testified that he resides in the city of Roanoke and is a locksmith and repairer of machinery; that some eight or ten years ago some officers of the N. & W. Rwy. Co. brought to him a lot of broken and out-of-repair switch-locks; that he repaired all that could be repaired, but threw aside in a pile those that could not be repaired, and that they remained there until he had to move, and not having a place to put them when he moved, he decided to take them to the junk-shop; that there were a small number, not half so many as the pile introduced in evidence, and they were all broken and in such a condition that they could not be repaired; that they were taken to the junk-shop of S. Goldman along with other junk, principally iron, steel and old files, and sold, he receiving therefor $2.00; this is the item which was found on the account-book of S. Goldman.

J. E. Craig, Sergeant of the city of Roanoke, testified that the switch-locks and brasses then in court were the same that were turned over to him for safe-keeping by W. G. Baldwin, at the adjournment of the grand jury; that he had kept them since that time under a lock and key.

R. A. Goldman testified that the "junk-shop in question was the property of his mother, S. Goldman; that she is a regularly licensed junk-dealer; that he, R. A. Goldman, is nineteen years of age, has no interest in the business and receives no salary for his services; that his brother, Herman Goldman, is the manager; that he, R. A. Goldman, stays about the place and does whatever he is told to do; that he cannot recollect whether he carried to the depot a barrel of junk referred to in the testimony of Mr. Slaughter, but it is very probable that he did; that he very often performed that character of work; that if he was told to carry it there, he did so; that he did not pack the barrel, and did not know what was in it, and had nothing to do with it; that he did not buy or receive the switch-lock or brasses now in court, and had nothing to do with the purchase of them; that he was present when Mr. Beeton brought the junk referred to in his testimony to his mother's place of business; that he did not have anything to do with the purchase of it, or the receipt of it, or the unloading of it; that it was unloaded by another party and piled up to one side, and he thinks that it was taken from that pile when it was shipped; that he knew neither of the purchase or receipt of any switch-locks, except what was bought from Mr. Beeton; that he remembers Baldwin coming to the place of business of his mother, with Rigney, at the time referred to by him; that he did not tell him what Baldwin said he did tell him, except that Baldwin asked him if he had bought any railroad brasses or any switch-locks since he had spoken to him about that matter a year ago, to which he replied that no switch-locks had been bought except from Mr. Beeton; that he did not have the other conversation with Baldwin, as stated by Baldwin.

The first question to be determined is, under what rule is this evidence to be considered by an appellate court? The opinion of the court, as I understand it, proceeds upon the idea that the judgment should be reversed unless the evidence is so conclusive of the guilt of the prisoner as to exclude every reasonable doubt to the contrary, or that if there be a reasonable doubt cast upon the proof of any fact essential to the guilt of the prisoner, it was the duty of the jury to acquit, or in the event that it found the prisoner guilty and the trial court entered judgment upon the verdict, it should be reversed and remanded for a new trial.

Such is not my understanding of the law. In all civil cases it is the duty of the jury to find in accordance with the preponderance of the testimony. In cases which involve moral terpitude, the jury are told that they should only make such an imputation upon the character of a litigant in obedience to clear and convincing testimony. It has been said in *Spindle* v. *Brockenbrough*, 17 Gratt. 21, that to convict a person of usury it must be proved beyond a reasonable doubt to the contrary; and in all criminal cases the court will, upon request, instruct the jury that such is their duty. But suppose the jury, in the exercise of their unquestioned prerogative, finds against the weight of evidence in a civil case, then the rule at once changes, and the case, at least in an appellate court, is heard as upon a demurrer to the evidence, and the question is no longer where the weight of evidence lies, but whether there is sufficient evidence to sustain the verdict. "Where the evidence is contradictory, and the verdict is against the weight of evidence, a new trial may be granted by the court which presides at the trial; but its decision is not the subject of a writ of error or *supersedeas*, or examinable by an appellate court, and this applies in criminal as well as in civil cases." *Grayson's Case*, 6 Gratt. 712.

The courts have in recent times struggled against the application of that rule in criminal cases.

When what is now section 3484 of the Code was first enacted,

it provided that when a case at law is tried by a jury and a party excepts to the judgment or action of the court in granting or refusing to grant a new trial on a motion to set aside the verdict as contrary to the evidence,  .  .  .  and the evidence is certified, the rule of decision in an appellate court, in considering evidence, shall be as upon a demurrer to the evidence by the appellant.

While in that form this court refused to apply it to criminal cases, but held it applicable only in civil cases; but when it was introduced into the Code as section 3484, it was expressly made applicable to cases at law, civil and criminal, and it now reads as follows:

"When a case at law, civil or criminal, is tried by a jury, and a party excepts to the judgment or action of the court in granting or refusing to grant a new trial on a motion to set aside the verdict of a jury on the ground that it is contrary to the evidence; or when a case at law is decided by a court or judge without the intervention of a jury, and a party excepts to the decision on the ground that it is contrary to the evidence, and the evidence (not the facts) is certified, the rule of decision in the appellate court in considering the evidence in the case shall be as on a demurrer to the evidence by the appellant, except that when there have been two trials in the lower court, in which case the rule of decision shall be for the appellate court to look first to the evidence and proceedings on the first trial, and if it discovers that the court erred in setting aside the verdict on that trial, it shall set aside and annull all proceedings subsequent to said verdict and enter judgment thereon."

That is the law by which we are governed in passing upon the case before us. However harsh and severe it may be, it is the law of the land, and while it so remains it should be loyally enforced. Courts have nothing to do with sympathy, or with policy. Their sole duty is to enforce the law. What then is the rule of decision upon a demurrer to evidence? It has been no-

where more clearly and forcibly stated than by this court, speaking through our lamented brother, Judge Riely:

"By the demurrer to the evidence the party demurring is considered as admitting the truth of his adversary's evidence, and all just inferences which can be promptly drawn therefrom by a jury, and as waiving all of his own evidence which conflicts with that of his adversary, and all inferences from his own evidence (although not in conflict with his adversary's) which do not necessarily result therefrom." *Johnson* v. *Chesapeake, &c. R. Co.*, 91 Va. 171.

Before undertaking to apply the rule thus clearly stated to the evidence before us, I will observe upon another feature of the opinion of the court. Reference is made to, and I presume reliance is placed upon, the fact that the principal witness for the Commonwealth is a detective. To this I reply that, while detectives may, and doubtless often do, become partisans and stretch the truth to sustain their theory of the case, they are necessary adjuncts to the administration of justice, and must of necessity be resorted to for the protection of society, and any criticism which may be levelled at them affects not the competency, but the credibility, of their testimony, and I presume it needs no authority to maintain the position that all questions affecting the credibility of witnesses come exclusively within the province of the jury, and its verdict is conclusive upon the subject.

First, then, is the evidence sufficient considered in the light of the rule established in, *Johnson* v. *C. & O. R. R. Co.*, *supra* and by virtue of section 3484 of the Code, the unquestioned law of this case, to establish the *corpus delicti*—sufficient to warrant the jury in finding that the property in question had been stolen from the Norfolk and Western Railway Company?

It is casually observed by one of the witnesses (Beeton) that some years ago locks and brasses had been brought to his shop for repair, the property of the Norfolk & Western railroad, and

this, the only mention of the Norfolk & Western railroad as distinguished from the N. & W. Railway Co., which I have been able to discover in the record, appears to have cast a doubt upon the ownership of the property. The Norfolk & Western Railroad Company was the predecessor in title of the Norfolk & Western Railway Company. It went out of existence years ago, and its franchises and property passed into the ownership and possession of the Norfolk and Western Railway Company.

It is proved that the locks in question are made by a particular manufacturer in Philadelphia, and delivered only upon the order of the railway company, and furnished only upon forms approved by said company; that the keys made for the locks furnished to the N. & W. Rwy. Co. would not open the locks made for any other company, although they might have the same initials; that these locks were not made for sale, but only for the use of the company, and were never sold or given away by it; that they were identical in appearance in all respects with the locks in daily use by the company at the present time, and that the keys now in use upon the switches of the N. & W. Rwy. Co. unlocked a portion of those locks; and, while the witness would not swear absolutely to the locks as being the property of the railway company, he believed that they were, and established their identity as completely as any honest witness could identify articles which are manufactured in large quantities and similar in all respects in appearance. To require a more complete identification than is given by the evidence in this case would preclude the jury, with respect to all articles similar in appearance, manufactured or otherwise, from fixing their ownership either in a civil case or criminal prosecution. To the untutored eye all the sheep in a flock look alike. Cattle and even horses are hard to identify; while in the case of manufactured articles, the catalogue would be endless, and especially is this true with respect to money, yet all personal property may be the subject of larceny; and it is for the jury to weigh the evi-

dence and pass upon its identity, and I cannot think that it is for the best interest of society that the court should establish an impossible standard. Is it possible to say that there is no evidence of the *corpus delicti* in the face of the proof to which I have adverted?

Let us consider, then, for a moment, whether the prisoner bought or received this property with intent to defraud. Whenever we get a glimpse in the evidence of the junk-shop of S. Goldman, R. A. Goldman is found to be in charge of it. He, and he alone, as far as the testimony other than his own proved, managed its affairs, received the articles in which it dealt, kept its books, prepared the goods for shipment, took them to the depot, and forwarded them to their destination. When the prisoner was asked by Baldwin if he had shipped any Norfolk and Western railway switch-locks in a shipment of old lead a few days ago to Baltimore, he replied that he had not, except old locks bought of Mr. Beeton, and that these were the only locks shipped at that time. He did not plead ignorance of the contents of the package. He asked no question and made no reference to it. He feigned no ignorance, but his answer was positive and direct. When he is confronted before the jury his attitude is altogether different. He knew then where the shoe pinched, and his testimony, if it is to be believed, completely exculpates him. He denies having had the conversation with Baldwin to which the latter testifies, but under the rule by which we are required to hear this case, that denial is in vain. It must be as completely effaced from the record as though he had never uttered it, and Baldwin's statement is as firmly established as though it were expressly admitted by Goldman to be true.

Junk-shops are doubtless useful and perhaps necessary. They furnish a market for much that would otherwise be lost, but it is a traffic capable of great abuse, and one which the Legislature has striven to regulate so as to render it, as far as possible, harm-

Dissenting Opinion.

less to society. For the sake of a few pennies, a house may be despoiled of its plumbing or a railroad switch, for the sake of the brass, be robbed of its locks. In the one case the house may be ruined, and in the other a train may be wrecked. Therefore, the Legislature has required that daily reports of their purchases be made by all licensed junk dealers, and has enacted the statute under which this prosecution took place, which provides that "if any person buy or receive pig-iron or railroad iron, brass, metal, or any composition thereof, with intent to defraud, he shall be confined in the penitentiary not less than one nor more than two years, or, in the discretion of the jury, in jail not exceeding one year. Possession of any pig-iron or railroad iron, brass, metal, or any composition thereof, so bought or received from any other person than the manufacturer thereof or his authorized agent, or of a regularly licensed dealer therein, shall be *prima facie* evidence of such intent." Code, sec. 3715 as amended by Acts 1889-'90, p. 30.

It is a reasonable and salutary law intended to regulate a business capable of great abuse, and ought, in my judgment, to be strictly enforced. A jury with all the facts before it, with a knowledge of the witnesses and of the whole environment which we do not possess, have found the prisoner guilty, and imposed upon him a moderate punishment, and I think their judgment is warranted by the testimony and should be sustained.

*McBride's Case*, 95 Va. 818, which is cited in the opinion of the court, well illustrates the position for which I contend. The court in the quotation made was dealing with an instruction to the jury, and not with the facts, and the error in the instruction was pointed out, and the law by which the jury should be guided was, I think, correctly stated. Here we are considering the power of a court over the verdict of a jury upon a motion to set it aside; and under the statute prisoner stands as a demurrant to the evidence. The duty of the jury was to acquit unless the evidence excluded every reasonable doubt of the prisoner's guilt,

Dissenting Opinion.

and it was the duty of the trial court, if requested, to so instruct them; but, the jury having rendered a verdict, we, sitting as an appellate court, are bound by the statute to apply the rule of *Johnson* v. *C. & O. R. R. Co.*, *supra.* I cannot reconcile the idea of hearing a case as upon a demurrer to evidence, and at the same time requiring the evidence to exclude all doubt as to the correctness of the demurrant's position. It would be to say that the verdict should be set aside if there was a reasonable doubt of its propriety which is utterly at war with, and subversive of, the doctrine of demurrers to evidence. The truth I believe to be as I have stated. The jury should decide all civil cases in accordance with the weight of evidence. They should acquit in criminal cases unless the evidence excludes all reasonable doubt of the prisoner's guilt, but if, in the exercise of their unquestioned prerogative, they find against the weight of evidence, the court cannot destroy the verdict for that reason, or because the judges, if on the jury, would have reached a different conclusion, or because they have a doubt where the jury had none. To say otherwise, would be to say that on a demurrer to evidence an appellate court would be obliged to set aside every verdict in a criminal case, which was, in the opinion of the court, contrary to the weight of evidence, for if we may weigh the evidence at all, then the preponderance of the evidence must in every case create a doubt; and, if the doctrine that a prisoner can only be convicted where there is no doubt of his guilt shall prevail, the conclusion logically follows that to create a doubt in an appellate court would require a reversal, and such doubt must always exist where the verdict is against the preponderance of evidence.

*Reversed.*