# Richmond.

## HARVEY v. COMMONWEALTH.

### January 12, 1905.

1. RAPE—*Insufficient Evidence.*—The conviction of a man seventy years of age of the crime of rape on the uncorroborated evidence of the woman, who made no complaint until after the birth of a child, and whose evidence otherwise bears the impress of falsehood on its face, cannot be sustained, although the plaintiff in error stands in this court as a demurrant to the evidence. The court cannot be expected to believe the incredible.

Error to a judgment of the Circuit Court of Charlotte county on a prosecution for rape.

*Reversed.*

The opinion states the case.

*W. C. Franklin* and *W. C. Carrington,* for the plaintiff in error.

*Attorney-General William A. Anderson,* for the Commonwealth.

HARRISON, J., delivered the opinion of the court.

In November, 1904, the plaintiff in error was indicted, tried, and convicted of the crime of rape, and now asks this court to

review the judgment of the Circuit Court of Charlotte county, sentencing him, in accordance with the verdict of the jury, to penal servitude for five years.

In the view we take of the case, it is only necessary to notice the fourth and last assignment of error, which is to the action of the court in refusing to set aside the verdict of the jury as contrary to the law and the evidence.

The record shows that the prisoner was a married man, about seventy years of age, and that the prosecutrix was a widow woman, who was the mother of two children. The statement of the prosecutrix is that on the 5th day of October, 1903, the prisoner called at her home in his buggy and told her that he had a note from her attorney at Pamplins, saying that he desired to see her on business; that she got in the buggy with him, and that he drove her to Pamplins, and put her out at the home of her friend, Mrs. Johnson, where she spent the night; that the next day the prisoner called for her, and they drove home together; that on the way home, just as they were reaching "Cub Creek," he made an improper proposition to her, which she rejected and started to jump out of the buggy, when he caught her by the arm, drove into the creek, and there drew his knife, saying that if she did not submit to him he would cut her throat; that he thereupon put her feet upon the spatter-board of the buggy, laid her back on the back of the buggy, and accomplished his purpose; that she made no outcry at the time for fear he would kill her; that none of her clothing was injured, and there were no marks of violence upon her person; that it was about half past eleven o'clock, and they did not stay in the creek but a very short time.

The evidence of the prosecutrix shows that the point where the road crosses "Cub Creek" is very public. The uncontradicted testimony of others is that it is one of the most public places on the road; that there are five mail boxes within fifty or

seventy-five yards· of the ford, and that it was about the time; of day .the mail carrier was due there; that there are a grist mill, saw mill, and a number of homes in the vicinity, at distances ranging from a half to one mile; that there are several other roads that come into the Pamplins road at that ·point, making the latter a very much travelled thoroughfare, and that the land around is clear, except a small piece on one side of the creek below the road.

That a married man, seventy years of age, could have committed the crime alleged upon a mature woman under the circumstances narrated, about noon, in a buggy in the public road at a point unusually exposed, where they might have been seen at any instant, challenges human belief. The prosecutrix further testifies that they proceeded on their way until they reached the home of Mr. Hunter, whom the prisoner desired to see about seed wheat; they were at Mr. Hunter's in less than a half hour after leaving the creek; that just before reaching the house the prisoner said, "If you tell Mr. Hunter about my treatment, I will kill you, and put you behind a log"; that she asked him to let her go in the house for a drink of water and he refused; that the prisoner got out and went to the gate; that Mr. Hunter came to the buggy and shook hands with her and asked them in to dinner, but they did not go. The uncontradicted testimony of Mr. Hunter is that he went to the buggy and shook hands with her, and invited her to get out and take dinner, but she declined; that he noticed nothing at all unusual about her, and saw no signs of excitement about her.

It is unnatural and difficult to believe that an innocent and helpless woman could, in less than a half hour after such an experience as is here described, be in the presence of another, calm, and without the slightest evidence of distress or excitement of any kind. It is also hard to imagine any one so desti-

tute of prudence as to take the victim of such·a diabolical crime immediately into the presence of another man, to whom she could and ought to have at once appealed for protection. It is equally incredible that a virtuous woman, upon whom such an outrage had been perpetrated, within less than a half hour, could be in the presence of a strong man and not appeal to that man to shield her from the demon who was threatening her life.

The further testimony of the prosecutrix is that they drove on, without incident, to her home, where she was turned over to her father and sisters· with whom she lived; with the home of her brother and his wife in sight, and that of her brother-in-law close by.  In the midst of this array of friends, not one of whom saw anything to suggest that she had been ill-treated, she remained, and not until after the 21st day of the following June, when she gave birth to a child, did she intimate to a human being that the outrage now charged had been perpetrated, giving as her reason for this suspicious, this amazing, silence that the prisoner had said that if she told he would kill her on the sly, and that she was ashamed to tell any one about it.

The prosecutrix was surrounded by friends amply able to protect her.  She was not in the power of or in any way under the control or dominion of the prisoner.  Her own evidence shows this, for she says that in the spring following the alleged outrage the prisoner came to her home when she was there alone, and that she said to him, " 'Look here, and see the fix you have put me in.'  He told me to lay the child to some one else, and he would give me as much money as I wanted.  I replied that 'I was not that sort of a woman; I have nothing but my character.' "  This .interview does not suggest fear, but a decided independence of the prisoner.  Further, the inquiry naturally arises, why did all of her alleged fear vanish as soon

Opinion.

as she could no longer conceal her shame, divulging, for the first time, as she says, this heinous crime to her doctor shortly after the birth of her child.

Notwithstanding the revolting circumstances attending the crime here charged, and the natural indignation and condemnation that it excites, still it is necessary to inquire and consider, under the law, whether that charge is sustained by the proofs. In such a case the inducements to falsehood are powerful. The account given by the prosecutrix bears the impress of falsehood on its face, and we are constrained to believe that the natural horror of this particular crime diverted the attention of the jury from a proper consideration of the evidence.

Viewing the case, as we have done, from the standpoint of a demurrer to the evidence, we find the proof wholly wanting to sustain the verdict, and upon that ground the judgment must be reversed, the verdict set aside, and the cause remanded for a new trial, to be had in conformity with the views herein expressed.

*Reversed.*