## Richmond.

THOMAS, ALIAS WRIGHT, v. COMMONWEALTH.

March 14 and 27, 1907.

1. CRIMINAL LAW—*New Trial—Rule Governing—Conflicting Evidence—Case at Bar.*—Motions for new trials are governed by the same rules in criminal as in civil cases. In neither case will this court reverse the judgment of a trial court overruling a motion for a new trial on the ground that the verdict is contrary to the evidence unless it finds that the evidence, considered as on a demurrer to the evidence by the plaintiff in error, is plainly insufficient to warrant the finding of the jury. It is not enough that the members of this court think that if they had been on the jury they might have found a different verdict. In the case at bar if the witnesses for the commonwealth were worthy of credit (and of this the jury were the exclusive judges), it cannot be said that the verdict of the jury was either contrary to the evidence, or without evidence to support it.

2. CRIMINAL LAW—*New Trial—Conflict of Evidence—Appeal and Error.* Where a case depends on the credibility of witnesses and the weight of the evidence, this court will not disturb the verdict of the jury approved by the judgment of the lower court.

3. TRIAL—*Procedure—Criminal Cases—Verdict Contrary to Evidence.*— The procedure with respect to the admission of evidence, the granting and refusing of instructions, and of saving objections for the appellate court are the same in civil and criminal cases. Indeed, upon a motion to set aside a verdict as contrary to the evidence, the statute in both classes of cases provides that the evidence shall be considered as upon a demurrer to the evidence by the plaintiff in error. So considering the evidence in this case, it is sufficient to support the verdict. The commission of the offense and the identification of the offender, by his victim, having satisfied the jury, their verdict cannot be set aside by this court even though the evidence of the victim were unsupported and uncorroborated.

4. EVIDENCE—*General Objection.*—A general objection to evidence which is in part admissible, ought not to be sustained, but the objec-

tion should state specifically the nature and extent of his objection.

5. Bills of Exception—*Rulings on Evidence—Objections—Waiver.*—If objection is made to the reception of evidence and is overruled, it will be deemed to have been waived unless saved by a proper bill of exception filed within the time prescribed by law.

6. Bills of Exceptions— *Refusal to Sign—Mandamus.*—If a bill of exceptions which presents the truth of the case be presented to the trial judge in due time he can exercise no arbitrary discretion in the matter. He must sign it, and, if he refuses, may be compelled to do so by mandamus.

Error to a judgment of the Circuit Court of Alexandria county sentencing the plaintiff in error to be hanged.

*Affirmed.*

The opinion states the case.

*J. E. Clements,* for the plaintiff in error.

*Attorney-General William A. Anderson,* for the Commonwealth.

Buchanan, J., delivered the opinion of the Court.

The plaintiff in error was indicted for rape. Upon his trial the jury found him guilty, fixed his punishment at death, and the trial court entered judgment in accordance with the verdict. To that judgment this writ of error was awarded.

Several grounds of error are relied on in the petition and in the written and oral argument of counsel for the accused, but the record does not show that any exception was taken to the rulings of the trial court, except its refusal to set the verdict aside because contrary to the law and the evidence, and its overruling the motion of the accused in arrest of judgment. The refusal of the court to set aside the verdict and to arrest the

judgment are, therefore, the only assignments of error that can be considered by this court.

It is settled law in this state that motions for new trials are governed by the same rules in criminal as in civil cases. *Grayson's Case,* 12 Gratt. 717, 727.

It is also well settled that an appellate court, upon a motion to grant a new trial because the verdict of the jury is contrary to the evidence, will not reverse the judgment of the trial court and award a new trial unless it finds that the evidence, considered as on a demurrer to evidence, is plainly insufficient to warrant the finding of the jury; and that the appellate court will not be justified in granting a new trial, even if its members should think that if they had been on the jury they might have found a different verdict. *Hill's Case,* 2 Gratt. 595; *Kates' Case,* 17 Gratt. 561; *Bull's Case,* 14 Gratt. 613, 621, 622; *Robertson's Case,* 2 Va. Dec. 142; 22 S. E. 359; *Nicholas' Case,* 91 Va. 741, 755, 21 S. E. 364.

It is insisted that the verdict is not sustained by the evidence upon three grounds: First, that the *corpus delicti* was not proved; second, that the accused was not identified as the party who committed the offense; third, that the evidence shows that the accused could not have been present when the crime was perpetrated.

The *corpus delicti* and the identity of the accused as the perpetrator of the crime were testified to directly and positively. The record shows that on the evening of September 9, 1906, which was Sunday, Forest Gooding and Mabel Risley, who were then engaged to be married and who were married before the trial of this case, went to Luna Park, in Alexandria county. They spent the evening in the park, visiting places of amusement until the lights were turned on. They then left the park and strolled up the road between the street car tracks and the park fence, and at the end of the fence turned to the left and walked along a path which led to a spring in the woods. After going a short distance beyond the spring they turned to come

back, when they saw a negro man lying or sitting down near
the path. When they got opposite to him he arose with a pistol
in one hand and a club, about three feet long and two inches in
diameter, in the other hand. He pointed the pistol at Gooding
and told him he was going to kill him, and after some words
struck Gooding, who attempted to ward off the blow, on his
left shoulder and on the left side of his head, but did not knock
him down. Gooding turned around and went a few steps when
he fell to his knees from the force of the blows. He got up
and ran toward the park gate for help, and in a few minutes
came back with some members of the special police force. After
Gooding was struck Miss Risley started to run, whereupon the
negro aimed his pistol at her and told her he would kill her
if she ran. She stopped and he seized her by the throat. While
he was choking her she screamed "murder!" and he again
threatened to kill her. He then threw her down, placed his
hand over her mouth, and, notwithstanding her struggles and
efforts to prevent it, ravished her, and afterwards robbed her of
$15.03 and two gold rings, and walked off. Immediately after-
wards, and while Miss Risley was getting up, Gooding and a
special police officer arrived. In a few minutes other members
of the police forced reached her. She at once told them that
she had been ravished and robbed by a man whom she de-
scribed as a big, square-shouldered, black negro, wearing dark
clothes, whom she could identify anywhere, and that she could
recognize his voice anywhere. The evidence also showed that
there were bruises upon her neck and legs, and her private
parts were swollen.

On the 16th of September, a week after the assault, the
accused was arrested upon another charge upon which he could
not be held, but was detained in custody because he answered
in a general way the description given at police headquarters
of the assailant of Miss Risley. On the 22d of that month
Miss Risley, together with Gooding, was brought to the jail
where the accused was in custody with a number of other pris-

oners to see if she could identify her assailant. She was told by the officer who accompanied her to look at the prisoners who were to be brought down without saying anything or pointing at any of them. Six or eight prisoners were then brought in, all of whom were negroes except one. After looking over the prisoners the officer asked if she was satisfied and she replied that she was. Upon going outside of the enclosure where the prisoners were she was asked if she saw among them the man who had assaulted her. She replied that she did, and that he was the second man on the right. That man was the accused. The officer had the accused brought out where they were and spoke to him, in order that Miss Risley might hear his voice. She said again that she was sure he was the man—that she recognized him and knew his voice. Gooding also identified the accused at the jail as the man who had assaulted him. Both Miss Risley and Gooding at the trial testified positively as to the identity of the accused, and when they were asked if they knew that their statements as to his identity might send him to the gallows they both replied that they did, but they were sure he was the man.

The precise time at which Miss Risley was assaulted does not clearly appear. The officers who accompanied or followed Gooding to the scene of the assault differ in their statements as to the time they reached Miss Risley, some fixing the time as early as eight o'clock and one as late as from 8:15 to 8:30. Some of the witnesses say it was between sundown and dark, others not quite dark, and another "good dark." The evidence does not show that when Miss Risley was assaulted it was too dark for her to get such a view of her assailant as to be able to identify him. She stated that she did see him and could recognize him anywhere. To the same effect was Gooding's statement. The deputy sheriff who did not reach Miss Risley until some minutes after the assault testified that it was then light enough to recognize a person standing near.

The accused introduced several witnesses who testified that

they were present at the jail when Miss Risley claims that she recognized the accused as her assailant, and that she did not do so. Some of them say she pointed out a negro known as "Alabama Joe" as her assailant, another that she pointed out a negro named Johnson. These witnesses are not only contradicted by Miss Risley and the officer who took her to the jail and who sustains her as to what took place there in every material particular, but they contradict each other.

To establish the alibi relied on the accused testified that he had never seen Miss Risley until he saw her at the jail; that on the evening of the assault he got a horse and buggy from Harrington's livery stable between 2 and 3 o'clock, took his wife and one Susie Bird out driving, and returned the horse and buggy to Harrington's stable that night at 8 o'clock. The accused proved by Harrington that he did get a horse and buggy from his stable between 2 and 3 o'clock the evening of the 9th of September, 1906, in the name of Mr. Nugent, who the accused said wished to take his wife out driving. Harrington further testified that he did not get back with the horse and buggy until after night, but he did not know the time. The accused also introduced Hannah Thomas, the woman whom he claimed to have driven out as his wife. She testified that on the evening of the 9th of September the accused had taken her and Susie Bird in his buggy to the new depot on the western side of the city of Alexandria. They got back from there about 6:30 or 7 o'clock, and they drove around the town until 8 or 9 o'clock, when they returned to the livery stable, delivered the horse and buggy and went home. Upon cross-examination she said she thought it was the 19th of September when the accused drove her out and they returned to the livery stable about 7:30 or 8 o'clock; that she was a married woman and the accused was a married man. She had separated from her husband and the accused from his wife; that she cohabited with the accused, but was not married to him. Susie Bird was not introduced as a witness.

In rebuttal the Commonwealth placed Mr. Nugent on the stand, who testified that on the 9th of September he was living in Alexandria city, about six squares from Harrington's stable. The accused told the witness that it was necessary for him (the accused) to be in Washington that afternoon to attend to some business, and he let him have $2.00 to get a horse and buggy from Harrigton's stables. About 8:30 or 9 o'clock that evening the accused drove to his (Nugent's) house. The horse was wringing wet with sweat and fagged out, and he told the accused that if he killed the horse he (Nugent) would have to pay for it, and not to take the horse back to the stable until it had rested and dried off. He knew it was between 8:30 and 9 o'clock when the accused drove to his house, because the clock was striking 9 when witness went back into the house. How far it is from Luna Park to the city of Alexandria does not appear, but Nugent testified that he could drive from Luna Park to his house in twenty or twenty-five minutes, and Harrington, a witness for the accused, testified that one could drive from Luna Park to his stables in about fifteen minutes in an ordinary gait. There was, therefore, sufficient time, according to the evidence, for the accused to have committed the crime for which he was indicted and to have reached Mr. Nugent's house between 8:30 and 9 o'clock, driving at an ordinary gait—certainly at the speed at which the horse's condition showed it had been driven.

There is no question of law involved in the case. The guilt or innocence of the accused is purely a question of fact. If the witnesses of the Commonwealth were worthy of credit (and of that the jury were the exclusive judges) there can be no question, as it seems to me, that the verdict is neither contrary to the evidence nor without evidence to support it. Where a cause depends upon the credibility of witnesses, upon the tendency and weight of the evidence, and the jury and the judge who tried the cause concur in the weight and influence to be given to that evidence, it would be, as was said by this court in *Blos-*

*ser* v. *Harshbarger,* 21 Gratt. 214, 216, "an abuse of the appellate powers of this court to set aside a verdict and judgment because the judges of this court, from the evidence as written down, would not have concurred in the verdict."

The assignment of error that the trial court erred in overruling the motion in errest of judgment seems not to be relied on, and properly so, as there is no ground upon which to base it.

I am of opinion, therefore, to affirm the judgment of the Circuit Court.

CARDWELL, J. (dissenting):

When this case was called for trial, the prisoner being unable to employ counsel, the court assigned two members of the bar to conduct his defense, and during the trial evidence in rebuttal introduced on behalf of the prosecution, in part given by a prisoner taken from the jail where she was held on the charge of the murder of her paramour, wholly irrelevant and of the most damaging character to the prisoner, was admitted; but to the rulings of the court during the trial, still more unfortunately for the prisoner, only one bill of exception was duly taken and made a part of the record, and that is to the action of the court overruling the prisoner's motion to set aside the verdict of the jury because it was contrary to the law and the evidence, and his motion in arrest of judgment. No ground was assigned for the motion in arrest of judgment, and the record presents no legal objections upon which the motion could have been sustained.

In support of the contention that the court below erred in denying the prisoner a new trial, because the verdict is contrary to the law and the evidence, two grounds are relied upon, viz: (1) That the *corpus delicti* was not established; and (2) that the evidence was not sufficient to warrant the jury in finding that the prisoner was the perpetrator of the alleged crime.

The evidence and not the facts having been certified in the

record, the rule of decision in this court in considering the evidence must be as on a demurrer to the evidence, and that rule has been so repeatedly stated in the decided cases as to render it needless to restate it here. Conceding that by this rule the judgment of the Circuit Court, in so far as it refused to set aside the verdict on the ground that the evidence was insufficient to establish the *corpus delicti,* must be sustained, although the concession cannot be made without misgivings as to the correctness of that finding, since the evidence for the prosecution, in my view of it, discloses facts and circumstances which are sufficient to create grave doubt in the mind of anyone freed from the bias and prejudice, which is unhappily and too often a controlling influence upon juries when dealing with the heinous and shocking crime of which the prisoner is accused, has he been identified as the perpetrator of the crime, "with that degree of certainty which the law in its wisdom has ordained"? In considering this question it will be necessary to examine the facts and circumstances appearing in the evidence, in the light of which the statements of the two witnesses for the prosecution, as to the prisoner being the perpetrator of the crime, are to be considered.

It appears that on the 9th of September, 1906, about 8 o'clock P. M., Mabel Risley and her escort, Forest Gooding, having come over from Washington city in the afternoon, were together in a secluded and unfrequented wooded place, about 200 yards outside the grounds of Luna Park, a public resort between Washington, D. C., and Alexandria, Va., to which secluded place, according to statements made by witnesses for the Commonwealth, Gooding said he had carried Miss Risley that she might respond to a call of nature; that Gooding left the place named and approached the guard at the park gate walking, and told the guard that somebody had taken his girl away from him, whereupon the guard went with Gooding, and when they approached Miss Risley she called out, "Where is my intended?" (meaning Gooding); and they (Miss Risley and Gooding) then stated to the guard that they had been attacked

by a colored man who had a pistol in one hand and a stick in the other, who struck Gooding on the back of the head and upon the shoulders. The girl said she had been assaulted, but went with Gooding to the Emergency Hospital in Washington, at once, where his wound, a cut about one inch long behind the left ear, was dressed, there being no other wounds or bruises on his body or face, and he and she left the hospital without any intimation to anybody there that a rape had been committed upon her, or that she was injured at all, except a bruise on her throat, upon which the doctor put some iodine. No physician was ever called to examine her, nor was any evidence offered that she had been examined; nor was there any evidence that she had been criminally assaulted, except her own statement, unsupported, unless it be by the statement of her sister with whom she was staying in Washington at the time, to the effect that she that night told witness and her husband of the assault and thereafter complained of "swelling in her private parts," and there was some bruises on her legs. Gooding told none of the people whom he saw that night that Miss Risley had been criminally assaulted, only said that "his girl had been taken from him," and on the witness stand he stated that he told Miss Risley not to tell her sister what had occurred, because her sister was sick in bed and it might throw her back; and that he had since the assault married Miss Risley. Miss Risley's statement is that she did not tell of the assault at once, as she wished to tell it first to her family doctor in Maryland.

Coming, however, more directly the evidence relied on as identifying the prisoner as the guilty party it is to be borne in mind that the prisoner was an entire stranger to both Mabel Risley and her escort, Gooding, neither having ever seen him prior to the night that this alleged crime was committed, and that the only impressions they could then have gotten of his features or general appearance were gotten in the darkness of only a starlight night, nearly two hours after sunset, and when they had but a short while before come out from under

the influence of the electric lights in Luna Park, where they had been attending amusements and sight-seeing, from sometime before the lights in the park were turned on till they left the park and went to a spring in the woods, beyond which the alleged assault upon her was committed. It is true that both Miss Risley and Gooding described the general appearance of the negro, who it was charged had committed the crime, to Deputy Sheriff Fields shortly after the occurrence, and Miss Risley then said that "she could identify the negro anywhere, and that she could recognize his voice anywhere"; but Gooding says that when he first saw the negro crouching in the grass but a short distance from him he took the object to be a cow. The guard who accompanied Gooding to the secluded spot where Gooding had left Miss Risley, makes the statement that ten minutes after he reached her he saw a black object running away, and another witness who went to where Miss Risley was says it was dark and that he could not tell the kind of dress she had on. About a week after this alleged occurrence the prisoner was arrested and committed to jail in Washington city on the charge of having failed to pay over a few dollars of collections as his employer's teamster, and on September 22, 1906, Miss Risley, at the request of Policeman Wood, of Washington city, accompanied Wood to the city jail for the purpose of identifying, if she could, the prisoner as the person who had assaulted her. When they, accompanied by Gooding, reached the jail about 8 o'clock at night, six or eight prisoners were brought down for Miss Risley to look at. They were arranged in a line and all were negroes except one, the white man standing in the rear of the line, and upon Wood and Miss Risley going inside the enclosure of the jail where the prisoners were, a guard at each end of the line held up a lantern, and there was a light on the wall in front of and above the heads of the prisoners, but it was a dim light. Wood, testifying for the prosecution at the trial of the prisoner, after stating the facts just narrated as to Miss Risley accompanying him to

the jail, etc., says, that after Miss Risley looked the prisoners over for several minutes, witness then said to her, "Are you satisfied?" and she said, "Yes"; whereupon witness said to her, "Step outside of the enclosure"; that Miss Risley did not point at any of the prisoners nor did she speak to any prisoner or any guard, or say anything while inside the enclosure; that after going outside of the enclosure witness asked Miss Risley if she saw among the prisoners the man who assaulted her, and she said, "Yes, the second man on the right is the man"; that witness said, referring to a negro named "Alabama Joe," "Are you sure it was not the second man on the left?" to which she replied, "No, the second man on the left looks like him, but he is not the man"; that the second man on the right was the prisoner at the bar. This witness further states that as the prisoners were going back to their cells he told Miss Risley he would have Wright (the prisoner at the bar) brought down, and he would talk to Wright in her presence, so she might hear his voice; that Wright was called back and witness in the presence of Miss Risley talked to Wright, and she said she was sure he was the man; that she recognized him and knew his voice. On cross-examination the witness stated that he did not know that a reward had been offered for the arrest and conviction of the perpetrator of this alleged crime when he arrested the prisoner September 16, 1906, nor at the time when Miss Risley identified the prisoner at the jail. As to what occurred at the jail in Washington the witness Wood is substantially corroborated by the evidence of both Miss Risley and Gooding; and both the last two named stated at the trial that the prisoner was the man who committed the assault upon Miss Risley. On the other hand, four of the officers, or guards, at the jail in Washington city testify that when the prisoner and six others were lined up before Miss Risley, as stated by the witness Wood, she, after full and careful inspection, picked out another and different man, viz: Henry Johnson, alias "Alabama Joe," who had been in jail for more than nine months. These four

witnesses, without the semblance of interest or concern in the result of the trial, so far as can be gathered from the record, agree as to the failure of Miss Risley to identify the prisoner as her assailant, and avow that she at first selected and designated "Alabama Joe" as the man, and did not agree that the prisoner was the man till after her conversation with Woods and the prisoner brought out to be questioned in her presence. It nowhere appears in the evidence that the prisoner was ever seen in or around Luna Park the evening of this alleged crime, and in this connection the following facts appearing in the record are worthy of serious consideration: First: All the witnesses agree that the assault upon Miss Risley occurred not earlier than 8 o'clock P. M., and, as we shall presently see, was after 8:15 o'clock P. M.; second, the guard at Luna Park, who first met Gooding walking in search of help in rescuing Miss Risley from the situation and surroundings in which he had left her, testifies that ten minutes after he reached her he saw a black object running away; third, Captain Turner, colored, who had been arrested and kept in jail about a week on suspicion of having assaulted Miss Risley, introduced as a witness for the prosecution, testified that he worked in the brick yard north of Luna Park, and had to pass Luna Park on his way home in the evening after his work was over; that on September 9, 1906, and for some time prior thereto, after his work was over at the brickyard, he had a habit of stopping at the northeast corner of Luna Park and holding horses for people who drove to the park; that on Labor Day, September 3, 1906, he saw the prisoner on foot walking around where witness was holding horses, which was about 100 yards from the spring where Miss Mabel Risley claims she was assaulted, and that he saw prisoner once after that lying on the grass about 100 yards from the spring; that he recognized the prisoner by his features, and also by his patent leather shoes; that on the night of September 9 he met Mr. Gooding running from the direction of the spring; that Mr. Gooding said he had

been struck by a man, and that the man had a gun; and Mr. Gooding wanted the witness to go down there, and witness replied that he did not want to go down there if the man had a gun.

Gooding lived in Washington on September 9, 1906, and for a short while prior. He testifies that he was never at Luna Park but once before and then with some boys, and makes no mention of having met on the night of the assault the negro Turner. On the contrary, his statement is that he, upon leaving Miss Risley, met first the guard at the park gate, who accompanied him back to where he had left her. Nor does Turner claim to have had any sort of an acquaintance with either Gooding or the prisoner. I am not, however, discussing the evidence of Turner with reference to its credibility, but to call attention to the circumstance of his acknowledged presence in the woods outside of Luna Park on the 9th of September, as accounting for the statement of witness Dye that he saw ten minutes after he got to Miss Risley, a black object running away, and as a circumstance, when considered in connection with all others appearing in the record, of no little importance to be considered in determining the question, whether or not the proof of the identity of the prisoner is sufficient to justify the verdict of the jury and the sentence of the court that he be hanged. Fourth. As remarked, all the witnesses agree that the alleged crime was committed not earlier than 8 o'clock p. m., and from their varied statements it was of necessity after that hour. The witness Dye states "it was after 8 o'clock," though he could not say the exact time. Price says "about fifteen minutes after 8 o'clock, or it might have been 8 o'clock." Field says that he went with the other officers (Dye and Price) to where Miss Risley was, and that he knew it was between 8:15 and 8:30 as he had taken notice of the time. According to the evidence, therefore, the black object running away was the guilty party, and this fact testified to by Dye could not have occurred earlier than 8:30 p. m.

In the afternoon, about 2 or 3 o'clock of the day of this alleged assault, the prisoner had, on an order from Thomas Nugent, his employer, hired a horse and a runabout in Alexandria city, and taken his paramour and also another colored girl out for a ride; and Nugent, a witness for the prosecution, testifies that the prisoner, about 8:30 or 9 o'clock p. m., drove up to his house with the horse and runabout; that the horse was "wringing wet with sweat and fagged out"; that a conversation between them followed, in which he told the prisoner that if he killed the horse witness would have to pay for it; that he told the prisoner not to take the horse back to the stable until the horse got dry; that he knew it was between 8:30 and 9 o'clock when prisoner drove to his house that night, because the clock was striking nine when witness went back into the house; and that he could drive from Luna Park to his house in Alexandria in twenty or twenty-five minutes. This statement fixes definitely the time at which the prisoner was at the house of Nugent, and allowing sufficient time for the calling out of Nugent from his house and for the conversation there had, which was in no way hurried, as it would seem, ending in time for Nugent to get back into his house as the clock was striking nine, it seems to me to be an utter impossibility that the prisoner could have been at the place of the alleged assault on Miss Risley ten minutes after the witness Dye reached her, leaving wholly out of view the great improbability that one who had committed so shocking and brutal a crime would have left the place of its perpetration and driven with such speed along the public highways and the streets of a city as to put his horse in a "wringing sweat," and a "fagged out" state, to the house of his employer and there call him out for a conversation on any subject. Yet to justify the affirmance of the conviction of the prisoner upon this record, it must be accepted as true that this is just what happened.

The locality of the crime is fixed in the woods outside of Luna Park and northeast therefrom the farthest point of the

park from Alexandria city, and, according to the evidence just adverted to, the prisoner left the scene of the crime, went to where he had left his horse and runabout, then drove at a high rate of speed along the public highways of Alexandria county to the city of Alexandria, thence along the streets of the city to the house of his employer, Nugent, and all this accomplished within the space of about twenty minutes time. For what reason the prisoner pursued such a course, unprecedented under the surrounding circumstances, is not suggested in the evidence.

I fully appreciate that it is a settled rule that the jury are the judges as to the credibility of witnesses and of the weight to be given their testimony, and that the rules governing the granting of new trials on the ground that the verdict of the jury is contrary to the law and the evidence, stated in *Grayson's Case*, 6 Gratt. 712, and reaffirmed in a number of later cases, are firmly established; but this court has reiterated, that while the rule requiring that the case must, in an appellate tribunal, be considered as upon a demurrer to evidence, may and often does require the court to accept as true that which is capable of proof, though the preponderance of evidence be ever so great against it, cannot compel us to accept as true what in the nature of things could not have occurred in the manner and under the circumstances narrated; and this court has again and again awarded a new trial where it could be seen from the whole record that either injustice has been done, or that the evidence was plainly insufficient to sustain the finding of the jury as to the main issue, or as to some fact necessary to be established by clear and satisfactory proof, to warrant the conviction of one accused of a crime. *McBryde's Case,* 95 Va. 818, 30 S. E. 454; *Hairston's Case,* 97 Va. 755, 32 S. E. 797; *Brown's Case,* 97 Va. 787, 34 S. E. 882; *Bundick's Case,* 97 Va. 783, 34 S. E. 454; *Goldman's Case,* 100 Va. 865, 42 S. E. 923; *Harvey's Case,* 103 Va. 850, 49 S. E. 481; *Johnson's Case,* 104 Va. 881, 52 S. E. 625.

Horrible beyond expression is the crime of which the judgment of the Circuit Court convicts the prisoner, but it would be still more baleful to endeavor to expiate it by taking the life of an innocent man, however humble and degraded in life he may be. *Johnson's Case, supra.*

In *Goldman's Case, supra,* the accused was convicted of buying and receiving railroad brasses, with intent to defraud, and the opinion says: "It devolves upon the Commonwealth to prove, first, the *corpus delicti,* that is, the fact that the crime charged has been actually perpetrated; and, secondly, that it was committed by the accused. To justify a conviction the evidence must be so convincing as to exclude every reasonable doubt of the guilt of the prisoner." Again, "an adherence to the basic principles upon which the criminal jurisprudence of this Commonwealth has ever rested is far too important to justify a departure from them in order to meet the exigencies of particular cases; and the hurtfulness to society of the class of offenses within the purview of the statute, affords no justification for the courts sustaining convictions in doubtful cases by way of prevention."

If the well settled principles, so forcefully expressed in the language just quoted, constrained the court in that case to award the accused another trial, surely they appeal with much greater force for application in the consideration of the evidence in a case where human life is involved. Human life is involved in this case and the whole record, when carefully read, as it appears to me, does not afford proof of the identity of the prisoner as the perpetrator of the crime, for which his life is to be taken as a penalty, with that "degree of certainty which the law in its wisdom has ordained."

Viewing the evidence from the standpoint of a demurrer to the evidence, the proof, in my opinion, is not only wanting to sustain the verdict of the jury, but, as was said in the opinion of this court in *Harvey's Case, supra,* constrains the belief that

the natural horror of this particular crime diverted the attention of the jury from a proper consideration of the evidence.

For these reasons I have to dissent from the view of the case taken by the court.

WHITTLE, J. (dissenting):

In addition to the views presented by Judge Cardwell in his dissenting opinion in this case, I wish to observe that I am in accord with the principle which forbids that a trial court, and *a fortiori* that this court, shall invade the province of the jury as triers of fact by granting a new trial in a case in which the evidence, although conflicting, fairly establishes the guilt of the accused, because of mere difference of opinion of the court and jury on the weight of evidence. I likewise acknowledge the binding effect of the rule of practice which requires that errors in admitting or excluding evidence must ordinarily be made the ground of exception to be availed of on writ of error. Nevertheless, experience teaches that cases occasionally arise in which the proceedings in the trial court are so far out of the usual course as to render the ordinary rules of procedure in the appellate court inadequate to meet the exigencies of the particular case. When confronted with such conditions, my opinion is that it is within the competency of this court to deal with the situation in such manner as may be necessary to prevent a failure of justice. The due administration of the law would not be promoted by a too strict adherence to customary rules of procedure in such case, but the tendency would rather be to unduly hinder the court of last resort in the state in the discharge of important functions, and reduce it to the level of a mere moderator, to receive and record the will of the jury, even though the court may be satisfied that the verdict was founded, in part at least, upon evidence wholly inadmissible and irrelevant to the issue which the jury were sworn to try.

I am, therefore, of opinion that where this court is convinced

by an inspection of the record that the irregularity in the trial of the case in the vital matter of admitting evidence renders it morally certain that in their finding the jury was materially influenced by incompetent evidence, although admitted without objection (a condition which indisputably prevailed in this instance), it ought, in the due exercise of its supervisory powers, to set aside the verdict and remand the case for a new trial. Especially is this true in a capital case, where the greatest liberality is allowed in granting new trials.

I am constrained by the foregoing considerations and the cogent reasons advanced by Judge Cardwell to withhold assent from the opinion of the majority of the court.

### UPON A PETITION TO REHEAR.

KEITH, P., delivered the opinion of the Court.

We are asked to rehear a judgment of this court rendered at a preceding day of this term, affirming the judgment of the Circuit Court of Alexandria county, by which petitioner was found guilty of rape and sentenced to be hanged.

A judgment upon which depends the life of a human being involves the gravest responsibility which a court can be called upon to discharge, and should receive its most careful consideration. Especially is this true when, as in this case, the court of last resort finds itself divided upon the question of the sufficiency of the evidence to establish the guilt of the accused.

The procedure with respect to the admission of evidence, to the granting and refusing of instructions, and to the preservation of objections made during the progress of the trial, taken for the purpose of bringing the case before the appellate tribunal, are the same in civil and criminal cases. Indeed, upon a motion to set aside a verdict as contrary to the evidence, civil and criminal cases are by statute placed upon the same footing, and the rule as to both is that the evidence shall be con-

sidered as on a demurrer to the evidence by plaintiff in error. Virginia Code (1904), section 3484.

We do not propose to enter upon a general discussion of the evidence. That was done sufficiently in the opinion heretofore delivered, where it was shown that the verdict of the jury was sustained by the direct and positive evidence of the woman upon whom the rape was alleged to have been committed, and by the testimony of her escort, who, upon being assaulted, knocked down by the blow of a club, receiving a severe contusion upon his head, and feeling himself at the mercy of his assailant, who was armed also with a pistol, hurried away to procure assistance, and returned as speedily as possible; but in the meantime, according to the testimony of the prosecutrix, the outrage upon her person had been committed. When her escort returned with an officer she immediately detailed all the circumstances substantially as they were related upon the trial. There are minor discrepancies in the testimony, which, if it be conceded that they tend to impeach the credibility of the witnesses for the prosecution, were solely for the consideration and determination of the jury. We know of no case in which it has been doubted or questioned that the jury were the uncontrollable judges of the credibility and veracity of witnesses, nor of any case in which there is so much as a suggestion to the contrary. The evidence, considered as upon a demurrer to evidence, by force of a statute applicable alike, as we have seen, to civil and criminal cases, is in our judgment sufficient to satisfy the demands of the law. We are bound by the law, and have no power to suspend, alter or relax its operation in order to meet a case of supposed or of real hardship.

But apart from all that, in view of the statements made and positions taken in the petition for a rehearing, it is not, we think, improper for us to say, with respect to a crime which is always committed in secret, that the proof of the commission of the offense and identification of the offender by the direct and positive testimony of his victim which satisfied the con-

science of the jury, could not, even though standing alone, unsupported and uncorroborated, be safely or wisely declared by an appellate court as a conclusion of law to be insufficient to support a verdict of guilty.

Much reliance is placed upon the admission of the testimony of Annie Green. Her testimony appears in the record. If a proper objection had been taken to it in the trial court it may be conceded that the objection would have been sustained. We say advisedly a *proper* objection, because a general exception to her testimony might, with propriety, have been overruled. There were parts of it which were admissible as impeaching, or tending to impeach the testimony of the accused himself.

It is well settled that a general objection to evidence which is in part admissible ought not to be sustained, but that the objector should state specifically the nature and extent of his objection. *Cluverius* v. *Com'th,* 81 Va. 787.

Where evidence is offered, a portion of which is objectionable and the other not, and the objection is general, it must be overruled. The objection must point out specifically the objectionable features. *Washington, &c., Ry. Co.* v. *Lacey,* 94 Va. 460, 26 S. E. 834.

But granting that the objection was properly made, it was not preserved by a proper bill of exception, and in such case the objection is held to have been waived. It was so held in *Lambert* v. *Cooper's Ex'or,* 29 Gratt. 61, where it is said that if objection is made to the admission of evidence of the character of a witness who had testified, on the ground that no proper foundation had been laid for its introduction, and the objections are overruled and the witness and the evidence is admitted, and the objector does not except at the time, or give notice of his intention to except before the verdict is rendered, he waived the objection, and cannot rely upon it upon a motion for a new trial."

In *Walkup* v. *Pickering,* 176 Mass. 174, 57 N. E. 354, it is said that if no exception is taken to the admission of tes-

timony, the question whether it was admissible or not is not open.

In *State* v. *McLaughlin*, 44 Ia. 84, which was a prosecution for rape, it is held that if a defendant in a criminal trial permits incompetent evidence to be introduced without objection, its admission cannot be made the ground of reversal of a judgment against him. In that case it was claimed that the verdict was not sustained by the testimony, and the court said: "The prosecuting witness testifies positively to the commission of the offense. Whether she was sufficiently corroborated by the admissions of the accused was properly submitted to the jury. We do not feel warranted in disturbing their finding."

This principle is maintained in innumerable cases, and is, as far as we are informed, nowhere denied. See *Cook* v. *Kilgo*, 111 Ga. 817, 35 S. E. 673; *Hutchmacher* v. *Lowman*, 66 Ill. App. Ct. 448; *Cone* v. *Montgomery*, 25 Colo. 277, 53 Pac. 1052; *Childs* v. *Nordella*, 116 Mich. 511, 74 N. W. 713; *Roehl* v. *Baasen*, 8 Minn. 26; *Simpson* v. *Myers*, 197 Pa. St. 522, 47 Atl. 868; *Ward* v. *Ward*, 22 N. J., L. 699.

It is earnestly asserted in the petition for rehearing, as was done upon the original hearing, that the accused did object to the admission of this testimony, and that he was refused a bill of exception and reduced to the alternative of accepting the bill which the judge signed, or of having no record which he could present to this court.

If such were the law, if the rights of a citizen, however humble he may be and however atrocious the crime with which he may be charged, were under the law to be determined by the arbitrary discretion of a judge, however eminent, it would be a reproach upon our jurisprudence which would call for a speedy and decisive amendment. But such is not the case. Every man accused of crime is entitled to be tried by the law of the land. If it be denied him he has the right to note his objection and to make it a part of the record, so that the ruling of the trial court may be reviewed, not only by the court of

appeals, but in a proper case by that tribunal of last and highest resort, the Supreme Court of the United States. If a bill of exceptions be offered a trial judge which presents the truth of the case, he can exercise no arbitrary discretion in the matter. He must sign it, and if he refuse to do so, the accused is not without his remedy.

In *Collins* v. *Christian, Judge,* 93 Va. 1, 24 S. E. 472, it is said: "The jurisdiction of this court, by *mandamus,* to compel the inferior courts to sign and seal bills of exception or to amend such bills according to the truth of the case, is no longer an open question in Virginia." It is accordingly held in that case, that "If, on application for a *mandamus* to compel a judge to sign a bill of exception, he answers that he refused to sign the bill because it did not state the truth of the case, and the relator traverse this answer, an issue of fact is presented, to be determined upon the evidence, whether the bill did correctly set forth the truth of the case. Under the facts of the case at bar, a *mandamus* is awarded to compel the judge of the inferior court to sign one of the bills tendered him, after making a slight alteration therein, but not the other, which is allowed to remain as already settled and signed by him." So that case presents a determination of the jurisdiction and its exercise by this court.

We do not wish to be understood as intimating that any right was denied to the prisoner by the judge of the Circuit Court. We merely mean to assert that if in this case, or in any case, the right of a person accused of crime to have the very truth of his case put upon the record in order that it may be the subject of review, be denied, there is ample remedy provided by law to meet such a case.

With a full sense of our responsibility we have reconsidered the question of procedure, and of law which arises upon this record, and are constrained to adhere to the judgment which has been entered.

The petition for rehearing is denied.

*Affirmed.*