## Richmond

JUNIUS L. SCOGGIN v. COMMONWEALTH.

March 24, 1932.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and Chinn, JJ.

The opinion states the case.

*F. P. Burton, W. L. Joyce* and *John W. Carter, Jr.*, for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

The defendant, Junius L. Scoggin, was indicted for rape by violence, tried, convicted and sentenced to four years confinement in the penitentiary.

He is a young married man, and had lived in Lawrenceville, Virginia, but came to Martinsville on November 15, 1930, for the purpose of soliciting advertisements, and made that town his headquarters until after December 2, 1930, the date on which this offense is charged to have been committed. He pretended to be unmarried.

Miss Mary Norman, the prosecutrix, was then between twenty and twenty-one years old. She lived in Martinsville, conducted a kindergarten there, and bore an excellent reputation.

On November 21st, she saw the defendant in a drug store, asked the clerk, a Mr. Dodson, who he was, and said that she would like to meet him. Dodson then promised her an introduction. That night there was a dance at the home of Miss Lillian Dyer. Scoggin was among those present, and manifestly had been drinking. Miss Norman came in late, and according to her evidence was dancing with a friend when they were rudely interrupted by the defendant, who asked that she dance with him. She refused to do so because he had not been presented, but some mutual acquaintance came to his assistance and introduced him. They did not dance, but in a short time went out of the house and got into the rear seat of a closed automobile parked before it.

Just how long they were there is a matter in dispute, but later that night Mr. Clift, who was its owner, left to take his friend, Miss Williamson, to her home, and with them

went Miss Dyer. When that party found this couple in the back seat it was suggested that they vacate, but the hint was not taken, and so, with three in the front seat and with the prosecutrix and the defendant still in the back seat, they drove to Miss Williamson's home, left her there and returned to the dance. Miss Dyer, who was hostess, then invited them to come into her house, they declined to do so, and continued to sit in the car. The length of their stay is likewise undetermined.

This was on Friday night. He called upon her at her home on the following Sunday, probably by appointment. He called again on the next Sunday night and took with him Mr. Sprinkle. Miss Norman, under some previous arrangement, had with her a friend who was to entertain Mr. Sprinkle, the understanding being that Scoggin was her particular guest. After some time Mr. Sprinkle and his companion went out for a little while, and were gone about thirty minutes. On each of these occasions Scoggin's claim is that he took, without protest, undue liberties with her person, and that they indulged in manifestations of mutual affection. All of this Miss Norman denies, and says that she was so careful that upon the last mentioned occasion, when Mr. Sprinkle and his friend were away, she had a little girl come and sit with them; the suggestion being that this chaperon would prevent the violation of any conventions.

The following Tuesday night, December 2, Scoggin and Sprinkle again called, and about ten o'clock they drove down to a drug store. No unusual expedition appears to have then been contemplated. Scoggin had no overcoat, and Miss Norman was thinly clothed. At the drug store he ordered two Coca-Colas, and directed that spirits of ammonia be added to his. While they were being prepared, he went to the rear of the room to telephone. Upon his return and after consuming these drinks, they left the drug store, re-entered Mr. Sprinkle's car and drove to the West

End filling station. He went into it, leaving her alone. When he came out she said that he was plainly drunk. In the meantime a Mr. DeHart and his wife came up and in their car was Mrs. R. N. Clark. Both of these cars were then driven back through Martinsville in the direction of Stuart, where Mr. DeHart lived. They passed and repassed each other several times. Finally the DeHart car stopped, as did Scoggin also, who then walked up to them, came back and returned with Miss Norman, who he introduced as his wife. She denied this relationship, but, if we are to believe Mrs. Clark's testimony, permitted him, without protest, to embrace and kiss her. They then went on to Stuart. Scoggin stopped at a pool room to telephone, again leaving the prosecutrix alone. Next they went to a hotel to get a room, but decided it would be unwise to do so. Her evidence is that he told the landlady they wanted the room, but she told her that he was too drunk to know what he wanted, and that what she wanted was a taxi to take her home. Nothing was accomplished, and they then drove to Mrs. Thompson's home where he gave to that lady some message for her son. Miss Norman said that she appealed to her for protection, but was given none, and was, in effect, made to leave the house. Miss Virgie Thompson is a public school teacher. She said that she and her mother were with Miss Norman out of the presence of the defendant, and that she neither appealed to them for protection, nor was she made to leave the home. She did say that Miss Norman expressed a desire to call up her people to relieve them of anxiety, and was advised to speak from "central" since it was a long distance call.

From the Thompson home they drove back towards Martinsville, and on their way came upon four men who had trouble with their car and who had built a fire by the roadside. They got out and stood by it; Miss Norman smoked a cigarette. Scoggin asked one of these men, John

Martin, to get them a room at Sandy Wood's house. To this she made no objection, but Martin refused to go, saying that the people there were asleep. Chick Dalton was also one of that party. He said that Scoggin asked who lived in a near by house, and requested that they wake the owner up and see if they could stay there all night. Buster Martin's evidence is to the same effect, while both he and Dalton said that kissing was then indulged in, and that the request that a room be secured met with no protest from the prosecutrix. They then drove on, stopped at another house and asked permission to spend the night there, but were refused that privilege. Next they stopped near the house of Myrian Clark. There they sat for some time, and there Scoggin said they attempted to have intercourse, but that it was so cold and the quarters were so cramped that it failed of consummation. They ended by agreeing that they would get a room in this home if possible and spend the night. In the meantime one Bob George came by, asked if they were in trouble, and was told they were not. Here, as always, Miss Norman has denied that she was ever consciously guilty of questionable conduct.

After some time the defendant went to the house and knocked for admission. Clark, from the upper story, asked what they wanted. Scoggin said he and his wife were about to freeze, and that he was anxious to have him take them in for the night. Miss Norman at that time sat in the car smoking a cigarette. After some parleying they were admitted. Before retiring she sat in Mrs. Clark's room, and told her they had been at Mt. Airy, and had had car trouble; that her home was in Richmond, and that she sang in the Baptist church.

When fire had been made in the guest chamber and it was ready for them, she borrowed a night gown from Mrs. Clark and went to their room. While it was being prepared for them she was alone with Mrs. Clark for ten or fifteen minutes and made no complaint.

Nothing occurred during the night, except that Mr. Clark heard some one go to the bath room about half an hour after they had retired. Her statement is that when she woke up next morning she was surprised to see Scoggin lying across the foot of the bed, and that she gathered up her clothes and went into the bath room to dress. Scoggin said that she slept with him as a wife. Their bed linen was soiled. When they came down she told her hostess that she was not accustomed to eating breakfast and wanted none, and that her husband was not well and did not want any himself.

The Clarks had been observing them for some time before admission to their home was asked, and heard no outcry. When they were admitted, she represented herself as his wife, or stood by in full possession of all of her faculties and heard him so declare.

During all of this experience, and certainly during the latter part of it, her claim is that she was dazed and at times oblivious of all that was going on, the suggestion being that she had been drugged; but witness after witness, in long procession, many of them manifestly people of position and all of them disinterested, from Mr. DeHart at the filling station to Mrs. Dyer at the Norman home the next morning, saw no evidence of any such condition, although Dr. Shackelford, who came after Mrs. Dyer had left, said that it was perfectly patent.

This much is plain beyond question: When she went to the Clark home she was entirely herself. She had every opportunity to repudiate Scoggin, but instead of availing herself of it, she gave the Clarks to understand that she was his wife, and of her own free will slept with him all night, and left upon the bed linen confirmation of conduct which she has not even attempted to explain.

We, in support of juries' verdicts, accept as true many things, but there is a limit to credulity. Such conduct on

the part of a woman who had just been raped, or maltreated in an attempt, and who had struggled until she had fainted, is unbelievable.

This is her account of the assault: "He threw me across the seat of the car, my head out of one door and my feet out of the other, had me under the steering wheel, and he broke the necklace. I heard them hit the running board." She said that she struggled as long as she could—"until I fainted or something"—and that she does not know what then happened.

There was introduced in evidence a statement signed by Scoggin, made on December 3, in which he exonerates his companion of all blame. That statement, he said, was made in accordance with an agreement with her entered into on their way back to Martinsville, and for her protection.

Upon her return home, the prosecutrix first told her mother that their car had broken down, and that she had to spend the night in Stuart. Mrs. Dyer, who was called over by Mrs. Norman on the morning of the return, said in part:

"Q. Mrs. Dyer, just tell the court and jury what Mr. Norman, or any of the boys, said to Mary in the presence of you there?

"A. The boys did not say anything, they ran out just as quick as Mary came in, and Mr. Norman asked her where she had been and she told him she had been to Stuart and the car had broken down, and they had a few words, and I came on home.

"Q. Any sharp words pass between Mr. Norman and Mary; did he appear to be angry?

"A. Yes; naturally he would be.

"Q. Did he have any weapons there?

"A. He took out a gun while I was in there and he told her to shut up, if she did not he would blow her brains out.

"Q. While you were there at any time did she tell him that she had been mistreated or attacked by this man?

"A. No, sir; she did not.

"Q. Why did you leave?

"A. I left when he got the gun out, because I was scared; I left because I did not think it was any of my business up there."

This witness further said: "She looked like she always did to me, only she looked frightened." It is to be remembered that Mrs. Dyer was a friend of the family, and was in that capacity called into conference.

Miss Norman has testified that she did not come to her senses until eleven or twelve o'clock next day. She denied having said that their car was broken down, and she denied having been threatened by her father.

Dr. Shackelford also was called in next morning. According to his testimony he found her doped and dazed, and said that this condition "lasted possibly the better part of the week." She must have testified before a grand jury on December 5th. He made no examination to ascertain the character of the poison, or its positive existence—observation was enough—and proceeded to give a list of drugs that might have been used. He said that he found her bruised about her person, with blood spots on her clothes, together with a man's discharge, but that no actual intercourse had been consummated. Dr. Shackelford's sister is the wife of Miss Norman's brother, and this witness was so interested in this case that he threatened to make local counsel suffer if they undertook to represent the accused.

Two other physicians examined the prosecutrix just before the trial, and testified that she is still a virgin. It is apparent that they base their judgment upon the fact that the hymen is not broken. That evidence is not conclusive. Wharton & Stille Med. Jour., volume 1, section 176.

This prosecuting witness has been contradicted at every turn by witnesses, many of whom were her friends, and she has told a story inherently improbable.

The law applicable to such a situation is well expressed by Mr. Justice Gregory in *Vance* v. *Commonwealth,* 155 Va. 1028, 154 S. E. 512, 513, where he said: "This court is not required to believe the statement of the prosecutrix. It is very improbable that any offense was committed against her. We are not required to believe that which is contrary to human experience and which we know to be incredible. We are not compelled to accept as true what in the nature of things could not have occurred in the manner and under the circumstances narrated. *Harvey* v. *Commonwealth,* 103 Va. 850, 49 S. E. 481; *Brooks* v. *Commonwealth,* 145 Va. 853, 134 S. E. 726; *N. & W. Ry. Co.* v. *Strickler,* 118 Va. 153, 86 S. E. 824; *C. & O. Ry. Co.* v. *Anderson,* 93 Va. 650, 25 S. E. 947." See, also, *Ford* v. *Engleman,* 118 Va. 89, 86 S. E. 852.

The simple explanation of it all is that she was frightened by her father, and was trying to extricate herself from an impossible situation, and in an attempt to do this was willing to put the defendant in peril of his life.

Seven jurors have petitioned the court to set aside their verdict, saying it should have been an acquittal, and that they had done the accused a great injustice. The court properly refused to permit these gentlemen to impeach their own verdict.

For reasons stated we are of opinion that the judgment complained of must be reversed, the verdict set aside, and the case dismissed; and it is so ordered.

*Reversed.*